637 P.2d 338 (1981)
The PEOPLE of the State of Colorado, Plaintiff-Appellee,
v.
Dana Eugene MORGAN, Defendant-Appellant.
No. 80SA272.
Supreme Court of Colorado, En Banc.
November 23, 1981.
Rehearing Denied December 14, 1981.
*339 J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., William Morris, Asst. Atty. Gen., Denver, for plaintiff-appellee.
Lee Jay Belstock, Denver, for defendant-appellant.
ROVIRA, Justice.
The defendant, Dana Morgan, appeals his conviction for murder in the second degree,[1] first-degree felony murder,[2] and second-degree kidnapping of Stuart Smollin;[3] first-degree burglary,[4] aggravated robbery;[5] criminal attempt to commit second-degree murder,[6] second-degree sexual assault,[7] and first-degree kidnapping[8] of Deborah Doe.[9]
The defendant claims that his trial was flawed because the trial court failed to instruct the jury on the defense of reduced mental capacity as to crimes with the mens rea of general intent, the jury verdicts were inconsistent, and the application of the felony-murder doctrine under the facts of this case constitutes a denial of due process and equal protection. The defendant also claims that the trial court erred in not instructing the jury during his sanity trial on the elements of the various offenses with which he was charged. We affirm.

I.
On the night of February 20, 1978, Deborah Doe and her friend Stuart Smollin returned *340 to Doe's apartment at approximately 10:30 p. m. The defendant, who lived in the same apartment house, was hiding, armed with a gun, in her apartment. Discovered, he demanded money and told both Smollin and Doe that he would leave them alone and not hurt them if they cooperated. After obtaining money from both of them, the defendant told Doe that he wanted her car and ordered them out to the parking lot where Doe's car was parked.
The defendant told Smollin to remove certain items from the trunk, forced him to get in, and then closed it. He then ordered Doe into the car and instructed her where to drive. After ordering her to stop at a deserted construction site, he committed a series of sexual assaults, both in and out of the car, on Doe. After completing the sexual assaults, he told Doe that he was sorry for what he had done and then had her open the trunk of the automobile. When Smollin started to get out, the defendant shot him and then turned and shot Doe twice, hitting her in the arm and the stomach. As Smollin was struggling to get out of the trunk, the defendant shot him again and slammed the trunk back on him. Doe was lying on the ground when she heard the defendant say, "What did the bitch do with the keys?" She let the keys drop from her hand; and the defendant walked over, picked them up, and drove away.
Doe eventually found help, the police were called, and she was taken to a hospital. She ultimately recovered from her wounds. The defendant returned to his apartment, leaving Smollin in the trunk of the car. He wiped off fingerprints inside the car, then hid his gun and the car keys in a utility room in the apartment house.
Smollin was alive when he was discovered at 2:00 a. m. the following day but died shortly thereafter. His death was caused by four bullet wounds.
Based upon Doe's report and the discovery of Smollin, the police began an immediate investigation. They checked apartments adjacent to Doe's, then went upstairs. The defendant responded when they knocked on his door. They told him that Doe had been kidnapped and asked if he had seen or heard anything unusual. The defendant told the officers that he had arrived home at approximately 10:30 p. m. and had heard nothing unusual until the arrival of the police. His behavior appeared normal, and he exhibited no signs of disorientation during the interview.
On February 21, Morgan packed his clothes, withdrew money from his bank account, and flew to Fort Smith, Arkansas, where he met a friend and told her the events of the preceding night. She, in turn, called the police who subsequently arrested him. The defendant voluntarily gave a statement to the Arkansas police, and later, Colorado authorities.
In his statements to the police Morgan said that he had a couple of drinks in a Denver bar on the evening of February 20. He returned to his apartment early in the evening; and after that, he could not remember anything other than driving back from where he had left Doe and realizing that there was a man in the trunk of the car whom he thought was dead, and he knew that he had killed that man.
The defendant entered a plea of not guilty by reason of insanity and was committed for observation and examination at the state hospital. At the defendant's request, he was given a psychiatric examination under sodium amobarbital by Dr. Dean Plazak on March 18, 1978.
During the sanity trial, Drs. MacDonald and Levy, testifying for the People, were of the opinion that the defendant was sane. Drs. Paras, Plazak, Frakes, and Roberts testified for the defendant. Paras and Plazak were of the opinion that the defendant was legally insane on the evening of February 20, but Frakes and Roberts were unable to form an opinion whether Morgan was sane or insane.
At the end of the evidence in the sanity trial, the defendant submitted ten instructions defining the elements of the offenses with which he was charged. The trial court refused to give these instructions on the grounds that they were not relevant to the *341 issue which the jury had to decide and they would be distracting and confusing.
The jury returned a verdict finding the defendant sane at the time of the commission of the alleged offenses.
Approximately five months later, the defendant went to trial charged with: (1) murder in the first degree after deliberation, (2) first-degree felony murder, (3) first-degree burglary, (4) aggravated robbery, (5) second-degree kidnapping, (6) criminal attempt to commit murder in the first degree, (7) first-degree sexual assault, and (8) first-degree kidnapping.
The jury returned a verdict of guilty on counts 2, 3, 4, 5, and 8 as charged. On count 1, they found the defendant guilty of murder in the second degree rather than murder in the first degree. On count 6, the jury found the defendant guilty of criminal attempt to commit second-degree murder rather than guilty of the offense of criminal attempt to commit first-degree murder. They found, on count 7, the defendant guilty of sexual assault in the second degree rather than sexual assault in the first degree. In the instructions covering counts 1, 6, and 7, the court also instructed on the appropriate lesser included offenses.

II.
At the conclusion of the sanity trial, the defendant requested the court to instruct the jury on the elements of the various crimes with which he was charged, along with the statutory definitions of "intentionally," "knowingly," "after deliberation," "bodily injury," "serious bodily injury," "deadly weapon," "thing of value," and "sexual penetration."
The trial court refused, holding that the tendered instructions were not relevant to the sole issue that the jury had to decide was the defendant sane or insane at the time of the commission of the offenses charged.
The defendant argues that the trial court erred in refusing to give his tendered instructions. He bases his argument on the proposition that "the jury's sole responsibility at the sanity trial was to determine whether the mental elements involving culpability could have been exercised during the commission of the acts involved." In support of his position he cites Parks v. District Court, 180 Colo. 202, 503 P.2d 1029 (1972) and People ex rel Juhan v. District Court, 165 Colo. 253, 439 P.2d 741 (1968).[10]
The defendant's interpretation of the jury's responsibility in a sanity trial is in error. By enactment of section 16-8-104, C.R.S.1973 (1978 Repl. Vol. 8), the legislature intended that when a defendant enters a plea of not guilty by reason of insanity the issues of guilt and legal accountability should be separated for trial purposes, and the sanity of the defendant is to be determined first. People v. King, 181 Colo. 439, 510 P.2d 333 (1973). The sanity trial is designed to determine whether the defendant was sane or insane at the time of the alleged offense, and the issue of guilt or innocence plays no part in the resolution of this issue. See Lewis v. Thulemeyer, 189 Colo. 139, 538 P.2d 441 (1975).
The narrow question presented at the sanity trial is whether the defendant was insane within the meaning of section 16-8-101, C.R.S.1973 (1978 Repl. Vol. 8). This section provides:
"Insanity defined. The applicable test of insanity shall be, and the jury shall be so instructed: `A person who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act, or being able so to distinguish, has suffered such an impairment of mind by disease or defect as to destroy the willpower and render him incapable of choosing the right and refraining from doing the wrong is not accountable; and this is so howsoever such insanity may be manifested, by irresistible impulse or otherwise. But care should be taken not to confuse such mental *342 disease or defect with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives, and kindred evil conditions, for when the act is induced by any of these causes the person is accountable to the law.'"
This definition addresses the issue of whether the defendant has sufficient mental capacity to be held accountable for any crimes he may have committed. It does not answer the question of whether the defendant was capable of forming a particular mental state required for a conviction of the substantive charge. This determination is left for another jury, pursuant to section 16-8-104, C.R.S.1973 (1978 Repl. Vol. 8). The trial court correctly refused to instruct the jury at the sanity trial on the elements and culpable mental states of the substantive offenses with which the defendant was charged.

III.
After the jury in the sanity trial found the defendant sane, trial on the eight counts of criminal conduct began.
The defendant admitted committing the acts charged. His sole defense was his impaired mental condition at the time of the commission of the crimes. He called Drs. Frakes and Plazak to testify concerning his mental condition.
Dr. Frakes, a clinical psychologist, testified that after examining the defendant he made a differential diagnosis, "differentiating between several psychiatric conditions." Frakes stated that Morgan was suffering from a dissociative state or hysterical amnesia or he was lying.[11] He could not say with a reasonable degree of psychological certainty which condition was applicable to the defendant.
Dr. Frakes testified that he was familiar with the statutory definitions of mental culpability. He opined that a person in a dissociative state would not be able to form a general or specific intent; and since a person who suffers from hysterical amnesia suffers after the fact, such a condition does not affect ability to form intent. He also testified that if the defendant was lying he would have been able to form a general or specific intent.
Dr. Plazak, a psychiatrist, stated that the defendant was suffering from "schizophrenia, paranoid type, characterized by delusions of influence and auditory hallucinations" and was of the opinion that Morgan, on the night of February 20, 1978, could not form a specific or general intent or form a mental intent after deliberation.
The People in rebuttal called Drs. MacDonald and Levy. Dr. MacDonald did not believe the defendant was suffering from schizophrenia, was skeptical of the claim of amnesia, and found no evidence of dissociative state. In his opinion the defendant at the time of the commission of the alleged crimes could act knowingly, intentionally, and after deliberation.
Dr. Levy testified that although the defendant was suffering from a personality disorder he found no evidence of schizophrenia or dissociative state. He also was of the opinion that the defendant was capable of acting knowingly, intentionally, and after deliberation.
The jury was presented with a full range of expert testimony; the prosecution's evidence was that the defendant was capable of acting intentionally, knowingly, and after deliberation, while the defendant's evidence was that he was unable to form any of those mental states due to his impaired mental condition. The trial court did not limit the testimony of the defendant's expert witnesses to the specific intent crimes with which he was charged; therefore, we conclude that it was admitted and considered as to all offenses, including general *343 intent crimes. People v. Gallegos, Colo., 628 P.2d 999 (1981).
Prior to the jury's deliberation, it was instructed, inter alia:
"It is the defendant's theory of this case that he was incapable of forming the requisite mental intents for all the crimes charged."[12]
and
"It is an affirmative defense to the crime of Murder in the First DegreeAfter Deliberation, First Degree Kidnapping, and First Degree Burglary, that the defendant, due to an impaired mental condition, did not have the capacity to form the specific intent required by these offenses."
The defendant argues that limiting the application of the affirmative defense of impaired mental condition to specific intent crimes denied him due process of law because it relieved the prosecution of the burden of establishing the culpability element of general intent crimes beyond a reasonable doubt.
We recently dealt with this precise issue in People v. Ledman, Colo., 622 P.2d 534 (1981). There we held that section 18-1-803, C.R.S.1973 (1978 Repl. Vol. 8), which limits the affirmative defense of impaired mental condition to specific intent crimes, was a reasonable exercise of legislative power and did not infringe upon the defendant's due process protections. In Ledman we noted that:
"the legislature ... may limit the range of criminal responsibility by establishing affirmative defenses to crimes, it also may limit those affirmative defenses to a particular category of crimes without offending due process. Due process requires only that the limitation not impair basic rights of the criminally accused."
Id. at 539, citing Patterson v. New York, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).
In People v. Gallegos, supra, we reaffirmed the rationale of Ledman and applied it to the second-degree murder statute, section 18-3-103, C.R.S.1973 (1978 Repl. Vol. 8). Section 18-3-103(1)(a) defines second-degree murder as causing the death of a person "knowingly, but not after deliberation."[13] Subsection (2) provides that "[d]iminished responsibility due to lack of mental capacity or self-induced intoxication is not a defense to murder in the second degree."
Under this statutory scheme, the prosecution retains the burden of establishing the defendant's guilt as to all elements of the crime beyond a reasonable doubt. People v. Ledman, supra. "The statutory scheme does not create any presumption of culpability, conclusive or otherwise. No such presumption was invoked by the prosecution and none was involved in the jury's resolution of this matter." People v. Ledman, supra, 622 P.2d at 539-40.
The rationale of these cases is equally valid here, and we find that the trial court correctly instructed the jury with respect to the affirmative defense of impaired mental condition. Here, as in Ledman and Gallegos, the defendant was allowed to contest the culpability element of "knowingly" during the trial. Furthermore, the jury was instructed that:
"It is the defendant's theory of this case that he was incapable of forming the requisite mental intents for all the crimes charged." (emphasis added).
*344 Under these circumstances, the defendant's challenge is without merit.

IV.
The defendant next contends that the jury verdicts were inconsistent and that it is a denial of due process of law to allow these contradictory verdicts to stand.
As previously noted, the jury found the defendant guilty as charged except on three counts where he was convicted of a lesser included offense. The defendant argues that these verdicts are inconsistent in light of the psychiatric testimony received in the case. He claims that the jury had a choice of either finding that he was suffering from such extreme mental problems that he could not act after deliberation, knowingly or intentionally, or that he was capable of acting intentionally, knowingly, and deliberately.
The defendant points to the fact that the jury failed to find him guilty of first-degree murder after deliberation, attempted first-degree murder, and first-degree sexual assault and, instead, convicted him of lesser included offenses on these counts. He argues that this renders the other verdicts in the case a nullity.
In Colorado, jury verdicts will not be reversed for inconsistency when the "crimes charged required different elements of proof, and the jury could ... find from the very same evidence that the element of one crime was present while at the same time finding that the element of another charged crime was absent." People v. Mayfield, 184 Colo. 399, 403, 520 P.2d 748, 750 (1974). See also People v. Fierro, Colo., 606 P.2d 1291 (1980).
Here, the crimes with which the defendant was charged required different elements of proof. The defendant's theory of the case was that he was incapable of acting with any level of criminal culpability, due to an impaired mental condition. Nonetheless, the jury is entitled to accept or reject the testimony of defendant's psychiatrists. People v. Garner, 187 Colo. 294, 530 P.2d 496 (1975).
The expert witnesses for the prosecution testified that the defendant was capable of acting with deliberation, knowingly, and intentionally. This did not compel the jury to conclude that the defendant had a particular mental state during the commission of the act. For example, in finding that the defendant did not commit first-degree murder after deliberation and did not commit a criminal attempt of first-degree murder, the jury could well have based its verdict on the evidence surrounding the actual shootings. Testimony at trial indicated that the defendant told Doe that he was sorry and that he would not hurt her. He then yelled to Smollin, who was still in the trunk, "Hey, Stuart, are you still with us?" Stuart asked to be let out, and the defendant told Doe to let him out. Then, suddenly, the defendant shot both of the victims. The jury could have concluded that the defendant did not act after deliberation because the shootings were committed "in a hasty or impulsive manner." See section 18-3-101(3), C.R.S.1973 (1978 Repl. Vol. 8).
The charges relating to first-degree murder require that the prosecution prove that the defendant acted after deliberation. See section 18-3-102(1)(a), C.R.S.1973 (1978 Repl. Vol. 8). This element of proof is not part of any of the other charges, and the verdicts are not inconsistent. People v. Mayfield, supra.

V.
Defendant next challenges the constitutionality of the felony murder statute. He contends that its application to the facts of this case deprives him of due process and equal protection of law because proof of a culpable mental state is not required to sustain a conviction under the statute.
The felony-murder statute has withstood constitutional challenge in the past. In Early v. People, 142 Colo. 462, 352 P.2d 112, cert. denied, 364 U.S. 847, 81 S.Ct. 90, 5 L.Ed.2d 70 (1960), we held that the legislature could provide that murder committed during the perpetration of robbery was murder in the first degree. This in no way *345 established a presumption as a substitute for proof of a culpable mental state, and the prosecution still had to prove the homicide and all elements of the underlying felony beyond a reasonable doubt. Id. at 474, 352 P.2d at 119.
The felony-murder statute provides, inter alia, that a person commits first-degree murder if he commits robbery and "in the course of or in furtherance of the crime ... or of immediate flight therefrom, the death of a person ... is caused ...." Section 18-3-102(1)(b), C.R.S.1973 (1978 Repl. Vol. 8).
Morgan argues that robbery cannot be used to support his conviction of felony murder because the robbery commenced and ended at a time significantly before the shooting and that the shooting could not have been in the course of, or in furtherance of, the robbery or in immediate flight therefrom as required by section 18-3-102(1)(b). We disagree. The perpetration of the robbery does not end at the moment the criminal receives the victim's money. See Whitman v. People, 161 Colo. 110, 420 P.2d 416 (1966). In the present case, the defendant told his victims that he needed money and that he was going to take them far enough away so that it would take a while for them to call the police. Therefore, the defendant was attempting to enhance his chances of escape when the shooting occurred. These acts, although not simultaneous with the taking of the victims' money, were in furtherance of the robbery. People v. McCrary, 190 Colo. 538, 549 P.2d 1320 (1976). Therefore, Morgan's commission of the crime of aggravated robbery will support a conviction of felony murder, and his constitutional argument is without merit. Early v. People, supra.
Defendant also argues that the failure to require proof of a culpable mental state for a conviction of felony murder violates the equal protection principles set forth in People v. Calvaresi, 188 Colo. 277, 534 P.2d 316 (1975), because the culpable mental state of gross negligence is required for a conviction of a less serious form of homicide, i.e., criminally negligent homicide. There is no merit to this argument.
Calvaresi held that statutes which provide different punishments for the same acts "committed under like circumstances by persons in like situations is violative of a person's right to equal protection of the laws." Id. at 282, 534 P.2d at 318. Felony murder is distinguishable from other forms of homicide so as not to come within the parameters of Calvaresi. The legislature may provide that a homicide committed during defendant's participation in a felony shall be punishable as first-degree murder. This legislative decision is in no way rendered arbitrary by a legislative determination that criminally negligent homicide, although requiring a culpable mental state, is a less serious offense. See People v. Calvaresi, supra.

VI.
Defendant's final contention is that there was insufficient evidence to support a conviction on the charge of first-degree kidnapping of Deborah Doe. He argues that the acts allegedly constituting first-degree kidnapping were not done with the intent to force the victim to make any concession in order to secure a release of a person under his control as required by section 18-3-301, C.R.S.1973 (1978 Repl. Vol. 8).[14]
In People v. Bridges, Colo., 612 P.2d 1110 (1980), we held that a charge of first-degree kidnapping could not be used to secure increased *346 penalties for acts which constitute sexual assault or robbery if the "evidence did not support the conclusion that the victim made or that the defendant intended to obtain a concession" in order to secure release as contemplated by the first-degree kidnapping statute. 612 P.2d at 1115. See also People v. Naranjo, Colo., 612 P.2d 1099 (1980); People v. Naranjo, Colo., 612 P.2d 1106 (1980); People v. Chatfield, Colo., 612 P.2d 516 (1980). Therefore, a review of the evidence establishing first-degree kidnapping is in order.
Here, there was uncontradicted testimony that Morgan told his victims that he needed a car in order to get away and that if they cooperated he would release them once they got far enough away so that it would take a while to call the police. Furthermore, during the sexual assault, the defendant continued to assure the victim that he would not harm her if she did what she was told. This evidence is sufficient to allow the jury to infer that the defendant intended to force concessions from his victim in order to secure her own and her friend's release.
Moreover, this case is unlike People v. Bridges, supra, because here the movement of the victim was more than incidental to the commission of robbery or sexual assault, and it substantially increased the risk of harm to the victim. See People v. Chatfield, supra; People v. Hines, 194 Colo. 284, 572 P.2d 467 (1977).
Sufficient evidence was presented from which the jury could conclude that the defendant forcibly seized and carried his victims from one place to another with the intent to force Deborah Doe to make concessions in order to secure release.
We affirm.
NOTES
[1] Section 18-3-103, C.R.S.1973 (1978 Repl. Vol. 8).
[2] Section 18-3-102, C.R.S.1973 (1978 Repl. Vol. 8).
[3] Section 18-3-302, C.R.S.1973 (1978 Repl. Vol. 8).
[4] Section 18-4-202, C.R.S.1973 (1978 Repl. Vol. 8).
[5] Section 18-4-302, C.R.S.1973 (1978 Repl. Vol. 8).
[6] Sections 18-2-101 and 18-3-103, C.R.S.1973 (1978 Repl. Vol. 8).
[7] Section 18-3-403, C.R.S.1973 (1978 Repl. Vol. 8).
[8] Section 18-3-301, C.R.S.1973 (1978 Repl. Vol. 8).
[9] We choose to use a fictitious name for the female victim who survived.
[10] These cases hold that a defendant in a sanity trial is entitled to the protection of a full hearing and that a finding of insanity is a complete defense to a criminal charge.
[11] "Dissociative state" was defined as a subclassification of hysterical phenomena in which a person under great stress loses awareness of himself for a period of time and acts in ways that are contrary to his conscience and general manner of acting. "Hysterical state" was explained as a condition where a person acts or carries out certain behavior and afterward cannot remember having done it even though at the time he was carrying them out he was quite aware of himself. The amnesia refers to the blocking out of certain events after the fact.
[12] The defendant offered the following instruction which was refused:

"It is the Defendant's theory of this case that he was incapable of forming the requisite mental intents for all the crimes charged by reason of impaired mental condition."
[13] Section 18-1-501(6), C.R.S.1973 (1978 Repl. Vol. 8) provides:

"All offenses defined in this code in which the mental culpability requirement is expressed as `knowingly' ... are declared to be general intent crimes. A person acts `knowingly'... with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists. A person acts `knowingly' ... with respect to a result of his conduct, when he is aware that his conduct is practically certain to cause the result."
[14] The first-degree kidnapping statute, section 18-3-301, provides in pertinent part:

"(1) Any person who does any of the following acts with the intent thereby to force the victim or any other person to make any concession or give up anything of value in order to secure a release of a person under the offender's actual or apparent control commits first degree kidnapping:
(a) Forcibly seizes and carries any person from one place to another; or
(b) Entices or persuades any person to go from one place to another; or
(c) Imprisons or forcibly secretes any person."