Lee Roy HENDERSHOTT, Petitioner,

v.

The PEOPLE of the State of Colorado, Respondent.

No. 80SC345.

Supreme Court of Colorado, En Banc.

Sept. 27, 1982.

Rehearing Denied Oct. 18, 1982.

James B. Breese, Legal Aid and Defender Program, University of Colorado School of Law, Boulder, for petitioner.

J.D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., John Daniel Dailey, Asst. Atty. Gen., Denver, for respondent.

QUINN, Justice.

We granted certiorari to review a judgment of the Boulder District Court affirming the conviction of Lee Roy Hendershott (defendant) for assault in the third degree. Section 18–3–204, C.R.S.1973 (1978 Repl. Vol. 8). The defendant was charged with knowingly or recklessly causing bodily injury to Patricia Styskal on April 28, 1979. In the course of a jury trial before the Boulder County Court the defendant offered psychiatric and psychological opinion evidence establishing that he suffered from adult minimal brain dysfunction for the purpose of negating the culpability elements of third degree assault. The trial court ruled that section 18–1–803, C.R.S.1973 (1978 Repl.Vol. 8), which establishes the affirmative defense of impaired mental condition for specific intent crimes, renders mental impairment evidence inadmissible as a matter of law in the prosecution of any crime not requiring a culpability element of specific intent. The defendant was convicted and, on appeal to the Boulder District Court, his conviction was affirmed. We conclude that the trial court's ruling, which precludes the defendant from presenting any mental impairment evidence to negate the requisite culpability for the crime charged against him, violates due process of law under the United States and Colorado Constitutions. U.S. Const. Amend. XIV; Colo. Const. Art. II, Sec. 25. Accordingly, we reverse the defendant's conviction and remand for a new trial.[1]

I.

In April 1979 the defendant was living in the rooming house of Patricia Styskal, whom he had dated intermittently for approximately three years. Problems developed in their relationship due to the defendant's excessive drinking, and on April 28, 1979, Ms. Styskal told the defendant he would have to move out. She drove him to a friend's house and then went to visit her sister. At approximately 9:30 p.m. the defendant returned to the rooming house and asked Richard Jacobs, a boarder, where Ms. Styskal was. After being told that she was not there, the defendant, who in Jacobs' opinion seemed to be somewhat intoxicated, stepped inside. He then began to talk incoherently, occasionally placing his hand on Jacobs' shoulder. Jacobs felt threatened by this gesture and left the house with the defendant in close pursuit. After Jacobs succeeded in pacifying the defendant, they returned to the house. Once again Jacobs left the house and the defendant chased him. A brief struggle ensued in the front yard but Jacobs was able to flee to the home of a friend.

At approximately 11:00 p.m. Ms. Styskal returned home and found the defendant waiting in her bedroom. The defendant accused her of having been out with another man. He then struck, kicked, and began to choke her. She was able to escape and fled to a neighbor's home. The police, who were immediately summoned, found the defendant unconscious in an upstairs bedroom of Ms. Styskal's home, and he was immedi-

---

1. Because of our disposition of the case we do not address the defendant's other claims, namely: that the trial court's ruling denied him due process of law by preventing him from offering evidence establishing his incapacity to satisfy even the minimum requirement for criminal liability of performing a voluntary act, section 18–1–501(9), C.R.S.1973 (1978 Repl. Vol. 8); and that, in view of section 18–1– 804(3), C.R.S.1973 (1978 Repl.Vol. 8), which allows a defendant to offer evidence of involuntary intoxication to establish his incapacity to conform his conduct to the requirements of law, the exclusion of mental impairment evidence to negate the requisite culpability for nonspecific intent crimes violates equal protection of the laws.

ately arrested and charged with assault in the third degree.

In the course of pretrial discovery the district attorney learned that defense counsel intended to offer at trial expert opinion evidence in order to establish that the defendant, due to adult minimal brain dysfunction,[2] lacked the requisite culpability of "knowingly" or "recklessly" essential to the crime of assault in the third degree. The district attorney filed a pretrial motion to exclude this evidence, arguing that section 18–1–803, C.R.S.1973 (1978 Repl.Vol. 8), restricts evidence of impaired mental condition to specific intent crimes[3] and that third degree assault was not a specific intent offense. The county court ruled the evidence inadmissible as a matter of law in prosecutions for crimes not requiring specific intent as an essential element of culpability. The jury found the defendant guilty and he was sentenced to six months with credit for time served.[4] The district court affirmed his conviction because, in its view, "evidence of mental impairment is inapplicable to a general intent offense, and the trial court did not err in excluding [such

---

2. Prior to trial the defendant was evaluated at the county jail by a treatment team consisting of a psychiatrist, Dr. Jed Shapiro, a psychiatric nurse, Connie Kendle, and a jail psychologist, Steven Fox. During a pretrial bond hearing Nurse Kendle testified that the defendant was diagnosed as suffering from adult minimal brain dysfunction, a condition characterized by heightened anxiety and a lack of impulse control approaching an automatic response to stimuli. Nurse Kendle testified that this disorder is similar to hyperactivity in children and only recently has been diagnosed in adults. In her opinion adult minimal brain dysfunction may cause the person to be "completely out of control" and not even conscious of what is happening. In this respect adult minimal brain dysfunction resembles an "intermittent explosive disorder" which is characterized by "several discrete episodes of loss of control of aggressive impulses that result in serious assault or destruction of property." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* III at 295 (1980). The essential features of the "intermittent explosive disorder" are described as follows:

"The degree of aggressivity expressed during an episode is grossly out of proportion to any precipitating psychological stressor. The individual may describe the episodes as 'spells' or 'attacks.' The symptoms appear within minutes or hours and, regardless of duration, remit almost as quickly. Genuine regret or self-reproach at the consequences of the action and the inability to control the aggressive impulse may follow each episode.... The behavior is usually a surprise to those in the individual's milieu, and even the afflicted individual is often startled by his or her behavior, sometimes describing the events as resulting from a compelling force beyond his or her control, even though he or she is willing to accept responsibility for his or her actions.... [F]eatures suggesting an organic disturbance may be present, such as nonspecific EEG abnormalities or minor, neurological signs and symptoms thought to reflect subcortical or limbic dysfunction .... Medi-

cal history often reveals hyperactive motor behavior and proneness to accident.... The disorder is apparently very rare." *Id.* at 295–96.

It has been reported that clinical and experimental evidence indicates that "explosive rage" often results from disorders which affect the limbic system, a phylogenetically ancient portion of the brain which is concerned not only with the expression of emotion but also with neural control of visceral functions and chemical hemostasis. Elliott, *Neurological Factors In Violent Behavior,* 4 Bull.Amer.Acad. Psychiatry and Law 297 (1976); Elliott, *The Neurology of Explosive Rage,* 217 Practitioner 51 (1976). The emotional dyscontrol which characterizes the "explosive rage" bears little resemblance to conventional anger, there being what appears to be a total transformation of the personality during these episodes.

3. Section 18–1–501(5), C.R.S.1973 (1978 Repl. Vol. 8), states that all crimes "in which the mental culpability requirement is expressed as 'intentionally' or 'with intent' are declared to be specific intent offenses." This same section also provides that a person acts "intentionally" or "with intent" when "his conscious objective is to cause the specific result proscribed by the statute defining the crime." All crimes in which the mental culpability requirement is expressed as "knowingly" or "willfully" are general intent crimes. Section 18–1–501(6), C.R.S. 1973 (1978 Repl.Vol. 8). Because the mental element of "recklessly" represents a less serious form of culpability than the element of "knowingly," section 18–1–503(3), C.R.S.1973 (1978 Repl.Vol. 8), a crime with the culpability requirement of "recklessly" is obviously not one of specific intent.

4. Assault in the third degree is a class 1 misdemeanor punishable by a sentence of not less than six nor more than twenty-four months in the county jail or by a fine of $500 to $5,000, or both. Section 18–1–106, C.R.S.1973 (1981 Supp.).

evidence]." We granted certiorari to consider the issue whether opinion evidence of a mental impairment due to a mental disease or defect may be admitted to negate the *mens rea* for a nonspecific intent crime such as assault in the third degree.

The defendant's contention on this appeal is that the trial court's ruling prohibited him from negating the essential culpability element of third degree assault in violation of due process of law, *U.S. Const.* Amend. XIV; *Colo. Const.* Art. II, Sec. 25. The People counter this contention with several policy considerations in support of a rule prohibiting an accused from offering evidence of impaired mental condition to contest the culpability elements except for specific intent crimes. Additionally, the People contend that even if the trial court's ruling was erroneous, the error was harmless. Before considering the respective claims of the parties we review some basic precepts of criminal and constitutional law to illuminate our analysis.

## II.

■ It is not open to question that the power to define criminal conduct and to establish the legal components of criminal liability is vested with the General Assembly. *Colo. Const.* Art. V, Sec. 1; *see, e.g., Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). Rarely, however, will a legislative body attempt to impose the sanctions of the criminal law on the blameless. Generally, in order to subject a person to criminal liability for a felony or serious misdemeanor, there must be a concurrence of an unlawful act (*actus reus*) and a culpable mental state (*mens rea*). *E.g., United States v. Bailey,* 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980); *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *People v. Marcy,* 628 P.2d 69 (Colo.1981). The Colorado Criminal Code recognizes this general precept by providing that "the minimum requirement for criminal liability is the performance by a person of conduct which includes a voluntary act or the omission to perform an act which [the actor] is physical-

ly capable of performing." Section 18–1–502, C.R.S.1973 (1978 Repl.Vol. 8). A "voluntary act" is an "act performed consciously as a result of effort or determination. . . ." Section 18–1–501(9), C.R.S.1973 (1978 Repl. Vol. 8). In most instances the legislature has required a more blameworthy level of culpability than the performance of a mere voluntary act, such as conduct performed "intentionally," "knowingly," "willfully," "recklessly," or "with criminal negligence." *See* section 18–1–501, C.R.S.1973 (1978 Repl.Vol. 8).

■ Once a person is charged with violating the criminal law, basic principles of constitutional law come into play and apply throughout the prosecution of the case. It is axiomatic that an accused is presumed innocent of the charge, and this presumption extends to every element of the crime including the requisite *mens rea. E.g., Taylor v. Kentucky,* 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978); *Morissette v. United States, supra; People v. Hill,* 182 Colo. 253, 512 P.2d 257 (1973). Additionally, due process of law requires the prosecution to prove beyond a reasonable doubt every fact necessary to constitute the crime charged before the accused may be convicted and subjected to punishment. As the United States Supreme Court observed in *In Re Winship,* 397 U.S. 358, 363–64, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368, 375 (1970), the reasonable doubt standard is the foundation upon which the American criminal justice system rests:

"The standard provides concrete substance for the presumption of innocence—that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.' . . ."

"The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. Accordingly, a society that values the good name and freedom of every individual should not condemn a man for

commission of a crime when there is rea- sonable doubt about his guilt.... To this end, the reasonable-doubt standard is indispensable, for it 'impresses on the tri- er of fact the necessity of reaching a subjective state of certitude on the facts in issue.' "

*Accord, e.g., Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *Patterson v. New York, supra; Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Even before the Supreme Court's decision in *In Re Win- ship,* this court recognized the reasonable doubt standard as a vital component of the Due Process Clause of the Colorado Consti- tution. *People ex rel. Juhan v. District Court,* 165 Colo. 253, 439 P.2d 741 (1968).

■ In addition to establishing the es- sential elements of criminal conduct, it is within the legislature's prerogative to for- mulate principles of justification or excuse, usually denominated affirmative defenses, and to limit these defenses to a particular category of crimes, so long as the basic rights of the criminally accused are not thereby impaired. *E.g., Patterson v. New York, supra; People v. Ledman,* 622 P.2d 534 (Colo.1981). The formulation and the limitation of affirmative defenses, however, must be distinguished from the accused's right to present reliable and relevant evi- dence to controvert the prosecution's case against him. "Few rights are more funda- mental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297, 312 (1973); *see Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (state statutory scheme which prevented an accused from securing coparticipant's testimony at trial denied the accused his constitutional right to compulsory process for obtaining wit- nesses in his favor).

■ As this court observed in *People v. Cornelison,* 192 Colo. 337, 559 P.2d 1102 (1977), much more than being a mere anom- aly, it would be a violation of due process to require the prosecution to establish the cul- pable mental state beyond a reasonable

doubt while, at the same time, to prohibit a defendant from presenting evidence to con- test this issue. Such a prohibition assumes all the features of an impermissible pre- sumption of culpability. While it may be permissible to permit a jury to infer an essential ingredient of a crime from a prov- en fact so long as there is a rational connec- tion between the proven fact and the in- ferred fact, *e.g., Barnes v. United States,* 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); *Tot v. United States,* 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943), it is quite another matter to insulate this ingre- dient from disproof by defense evidence. A rule precluding the defendant from contest- ing the culpability element of the charge would render the prosecution's evidence on that issue uncontestable as a matter of law, in derogation of the presumption of inno- cence and the constitutional requirement of prosecutorial proof of guilt beyond a rea- sonable doubt. *E.g., Sandstrom v. Mon- tana,* 442 U.S. at 520–24, 99 S.Ct. at 2457– 59, 61 L.Ed.2d at 48–51; *Morissette v. Unit- ed States,* 342 U.S. at 274–75, 72 S.Ct. at 255–56, 96 L.Ed. at 306–07. With these principles in mind, we turn to the chal- lenged ruling of the trial court.

### III.

The charge in this case alleged that the defendant committed the crime of assault in the third degree by "knowingly" or "recklessly" causing bodily injury to anoth- er person. Section 18–3–204, C.R.S.1973 (1978 Repl.Vol. 8). The statutory defini- tions of the terms "knowingly" or "reckless- ly" are as follows:

"A person acts 'knowingly' ... with re- spect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists. A person acts 'knowingly' ..., with respect to a result of his conduct, when he is aware that his conduct is practically certain to cause the result." Section 18–1–501(6), C.R.S.1973 (1978 Repl.Vol. 8).

"A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that a result will occur or that a circumstance exists." Section 18–1–501(8), C.R.S.1973 (1978 Repl.Vol. 8). The trial court's refusal to permit the defendant to offer mental impairment evidence establishing that he lacked the requisite culpability for third degree assault due to adult minimal brain dysfunction was based on section 18–1–803, C.R.S.1973 (1978 Repl.Vol. 8), which provides:

"Evidence of an impaired mental condition though not legal insanity may be offered in a proper case as bearing upon the capacity of the accused to form the specific intent if such an intent is an element of the offense charged."

The trial court construed this section to prohibit the admission of all mental impairment evidence in prosecutions for nonspecific intent crimes and the district court adopted the same construction. This construction, in our view, cannot be justified as a legitimate constitutional option.

### A.

▪ In several recent cases we have addressed the difference, for constitutional purposes, between limiting an affirmative defense to a certain category of offenses and denying an accused the right to offer evidence in order to contest the essential elements of the charge. *People v. Morgan,* 637 P.2d 338 (Colo.1981); *People v. Gallegos,* 628 P.2d 999 (Colo.1981); *People v. Fite,* 627 P.2d 761 (Colo.1981); *People v. Ledman, supra.* We noted in these cases that the limitation of the affirmative defense of impaired mental condition to specific intent crimes does not, by itself, either create a presumption of culpability for specific intent crimes or derogate the accused's due process right to prosecutorial proof beyond a reasonable doubt.[5] In each of these cases the defendant's mental impairment evidence was not limited to the issue of specific intent only; thus, the jury was free to consider this evidence in determining whether the prosecution had satisfied its constitutional burden of proof on the requisite mental state of "knowingly." We also emphasized in these cases that a distinct but unanswered question was whether section 18–1–803 could be applied in a manner that prohibited an accused from offering mental impairment evidence to contest the culpability element for nonspecific intent crimes. It is this precise question which is raised here.

As we view it, the construction placed on section 18–1–803 by the trial court renders all mental impairment evidence incompetent as a matter of law for crimes not requiring a specific intent. Although the defendant's proffered evidence was in the form of expert opinion testimony, the logi-

---

5. We do not read the text of section 18–1–803 as requiring the construction adopted by the courts below. Under the Colorado Criminal Code the issue of responsibility is an affirmative defense. Section 18–1–805, C.R.S.1973 (1978 Repl.Vol. 8). Section 18–1–803 provides that one may be relieved of criminal responsibility for a specific intent crime by reason of impaired mental condition. The statutory inclusion of impaired mental condition as an affirmative defense has significant consequences for the prosecution's burden of proof. Section 18–1–407, C.R.S.1973 (1978 Repl.Vol. 8), provides that once some credible evidence on an issue involved in an affirmative defense is presented, the prosecution must prove the guilt of the defendant beyond a reasonable doubt "as to that issue as well as all other elements of the offense." Thus, where an accused is charged with a specific intent crime and the affirmative defense of impaired mental condition is raised, section 18–1–803 creates a twofold burden of proof for the prosecution. First, it must prove the accused's guilt as to all the essential elements of the crime. Next, it must establish that, notwithstanding the evidence of impaired mental condition, the defendant did have the mental capacity to form the specific intent required for the crime charged. The prosecution's burden in this latter respect might be viewed as proving a negative—that is, the absence of a mental impairment sufficient to incapacitate the defendant from forming the requisite specific intent. This requirement of proving a negative is not unique in criminal jurisprudence. *See Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Viewed in light of these considerations, section 18–1–803 represents a statutory affirmative defense for specific intent crimes rather than, as construed by the courts below, a statutory prohibition of mental impairment evidence in all but specific intent offenses.

cal basis of the trial court's ruling would encompass all evidence of mental incapacity from whatever source, including the defendant. However, we need not labor over the precise limits of the trial court's ruling because, whatever its perimeter, we find it irreconcilable with the basic rights of the accused in a criminal prosecution.

■ An accused is not only entitled to the presumption of innocence on all elements of a charge but also is protected against a conviction unless the prosecution establishes the requisite *mens rea* by proof beyond a reasonable doubt. In this case the defendant at trial did not dispute that he caused physical injury to Patricia Styskal. Indeed, the state's evidence on this aspect of the charge was formidable. The only disputed issue was whether the defendant caused the injury with the requisite culpability of "knowingly" or "recklessly"—a matter which he sought to contest on the basis of adult minimal brain dysfunction. The trial court's exclusion of the mental impairment evidence rendered the prosecution's evidence uncontestable as a matter of law on the issue of *mens rea,* thus adversely implicating the constitutional presumption of innocence.

Ordinarily the jury in its deliberative process has wide latitude in weighing evidence. For example, it may choose to accept particular evidence offered by the prosecution or the defense and to reject any evidence to the contrary, or it may simply conclude that the prosecution has failed to meet its burden of proof. When, however, an accused is precluded from controverting the prosecution's evidence on the element of *mens rea,* the jury's deliberative process on that element is limited to the single evidentiary consideration of whether the prosecution has met its constitutional burden of proof. Under such circumstances the issue of *mens rea* will be resolved solely on the basis of the jury's inference of this element from the prosecution's uncontestable evidence. An inference, the existence of which as a matter of law cannot be controverted, in practical effect becomes so compelling as to assume all of the features of a

presumption. Such a *de facto* presumption of *mens rea* clashes head-on with "the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime," including elements of "knowingly" or "recklessly" in the case of third degree assault. *Morissette v. United States,* 342 U.S. at 275, 72 S.Ct. at 256, 96 L.Ed. at 307; *see also Sandstrom v. Montana, supra; United States v. Gypsum,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *People v. Kanan,* 186 Colo. 255, 526 P.2d 1339 (1974).

Similarly, precluding an accused from offering mental impairment evidence to negate culpability undermines the constitutional protection against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship,* 397 U.S. at 364, 90 S.Ct. at 1073, 25 L.Ed.2d at 375. This constitutional standard of proof contemplates that a determination of guilt will only ensue if, notwithstanding reliable and relevant evidence to the contrary, the state proves that each essential element of the crime has been established to the requisite level of certitude. A reasonable doubt as to guilt may arise not only from the prosecution's case, but also from defense evidence casting doubt upon what previously may have appeared certain. Denying the defendant any opportunity to controvert the prosecution's case by reliable and relevant evidence of mental impairment, in addition to cutting against our traditional concept of the adversary system, downgrades the prosecution's burden to something less than that mandated by due process of law. *See, e.g., Sandstrom v. Montana, supra; United States v. Gypsum, supra; People v. Cornelison, supra; People v. Kanan, supra; People ex rel. Juhan v. District Court, supra.*

■ Once we accept the basic principles that an accused is presumed innocent and that he cannot be adjudicated guilty unless the prosecution proves beyond a reasonable doubt the existence of the mental state required for the crime charged, it defies both logic and fundamental fairness to pro-

hibit a defendant from presenting reliable and relevant evidence that, due to a mental impairment beyond his conscious control, he lacked the capacity to entertain the very culpability which is indispensable to his criminal responsibility in the first instance. We therefore disapprove the trial court's ruling as violative of due process of law and hold that reliable and relevant mental impairment evidence is admissible, upon proper foundation, to negate the culpability element of the criminal charge.[6]

### B.

The People have urged a contrary holding and have raised several policy arguments to that end. These arguments, however, do not reconcile the trial court's ruling with the constitutional rights of the criminally accused. Instead, they focus primarily on the arguably adverse consequences that the admission of mental impairment evidence in the trial of nonspecific intent crimes will hold out for the criminal justice system. Because of this focus we elect to address the People's arguments and explain why we consider them unpersuasive.

The People initially argue that the admission of mental impairment evidence to negate the *mens rea* for crimes not involving a specific intent would render the insanity defense an unnecessary option in prosecutions for such offenses. This argument fails to properly account for the prosecution's constitutional burden to prove the accused's culpability for the crime charged beyond a reasonable doubt. A person who is criminally insane is excused from criminal responsibility for his actions because, due to a mental disease or defect, he lacks the capacity to distinguish right from wrong with respect to the act or to adhere to the right or refrain from the wrong. Section 16–8–101, C.R.S.1973 (1978 Repl. Vol. 8).[7] This is not to say, however, that legal sanity is a proxy for *mens rea*.[8] The prosecution's burden of proof on the requisite *mens rea* for a crime is no less where the defendant has previously been adjudicated legally sane in a sanity trial than in a

---

6. Our holding conforms to the Model Penal Code which provides:

   "Evidence that the defendant suffered from a mental disease or defect shall be admissible whenever it is relevant to prove that the defendant did or did not have a state of mind which is an element of the offense." Model Penal Code § 4.02(1) (Tent. Draft No. 4, 1955).

   In holding mental impairment evidence admissible, we believe that the trial court appropriately may require the defendant, as the proponent of such evidence, to demonstrate the reliability and relevancy of the proffered testimony as a condition precedent to admissibility. See C.R.S. 104(a) and (b). In this respect the trial court may require the defendant to establish at an *in limine* hearing the following factors: the qualifications of the prospective witness to offer opinion evidence on mental impairment, including the witness's familiarity with the requisite culpability element of the crime in question; that the cause of the mental impairment was a recognized mental disease or defect and that the defendant suffered from such impairment at the time of the offense; that the witness has an opinion, at least to a probability, that the disease or defect prevented the defendant from having the requisite culpability for the crime charged; and the facts or data on which the witness bases the opinion.

7. Section 16–8–101 states the applicable test of insanity, and that the jury shall be so instructed as follows:

   "A person who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act, or being able so to distinguish, has suffered such an impairment of mind by disease or defect as to destroy the willpower and render him incapable of choosing the right and refraining from doing the wrong is not accountable; and this is so howsoever such insanity may be manifested, by irresistible impulse or otherwise. But care should be taken not to confuse such mental disease or defect with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives, and kindred evil conditions, for when the act is induced by any of these causes the person is accountable to the law."

8. Section 18–1–803, which creates the affirmative defense of impaired mental condition for specific intent crimes, is premised on the proposition that a mental disease or defect may be less than legal insanity but nonetheless sufficient to negate the requisite *mens rea* of specific intent. The logical extension of the People's argument would be to prohibit this affirmative defense in specific intent crimes also, a step which the legislature obviously has not decided to take.

prosecution where the sanity issue has not been raised at all. In both instances the requisite *mens rea* must be proven beyond a reasonable doubt or the defendant is constitutionally entitled to an acquittal. To prohibit the defendant in this case from contesting the *mens rea* of "knowingly" or "recklessly" except by raising the insanity defense would be nothing short of a conclusive presumption of culpability and, as previously noted, would be constitutionally intolerable.

■ The People next point to the problems of proof which arise when psychiatric testimony is admissible. In the People's view these problems are due primarily to the inexact and tentative nature of psychiatry and would be exacerbated by the admission of mental impairment evidence to negate such culpable mental states as "knowingly" or "recklessly." This argument, however, overlooks the essentially subjective character of the issues relating to criminal culpability. These issues involve moral, legal and medical components and rarely, if ever, will they be resolved on the basis of objective scientific evidence. *See, e.g., King v. United States,* 372 F.2d 383 (D.D. App.1967). To be sure, the subjective character of these issues undoubtedly will generate disagreement among psychiatric experts, especially since psychiatry is far from an exact science. Nonetheless, there is no reason to believe that psychiatric testimony is any less helpful to the fact finder in resolving whether a defendant acted "knowingly" or "recklessly" than in determining whether he had the capacity to form the "specific intent." This court long has recognized the reliability and usefulness of psychiatric opinion evidence in a variety of proceedings involving the mental state of an accused. *See, e.g., People v. Wright,* 648 P.2d 665 (Colo.1982) (expert testimony, including opinion evidence on minimal brain dysfunction, admissible in sanity trial);

*People v. Raffaelli,* 647 P.2d 230 (Colo.1982) (expert opinion testimony relating to defendant's mental condition admissible to show that her confession was involuntary); *People v. Mack,* 638 P.2d 257 (Colo.1981) (expert opinion testimony admissible to show defendant's mental competency to undergo trial); *Garza v. People,* Colo., 612 P.2d 85 (1980) (expert opinion testimony admissible on issue of whether the defendant has established good cause for the entry of a plea of not guilty by reason of insanity after arraignment); *Ingles v. People,* 92 Colo. 518, 22 P.2d 1109 (1933) (evidence of any mental derangement admissible to negate culpability element for first degree murder).[9] In short, we prefer to rely upon the good sense and judgment of jurors and trial judges in evaluating the opinions of experts, each of whom may express contrary views on a given issue, rather than excluding as a matter of law evidence which cannot help but enhance the reliability of the fact-finding process.

■ The People's last policy argument is that the protection of the community justifies the exclusion of mental impairment evidence in nonspecific intent crimes. The logic of the People's argument is that, notwithstanding the lack of *mens rea* for the commission of a criminal offense, mentally disturbed persons should not be completely set at liberty upon their acquittal. As we see it, the solution of the problem posed by the People does not lie in barring the admission of mental impairment evidence to negate the requisite culpability for the crime charged, but rather in providing for the confinement and treatment of persons who are mentally ill and pose a danger to themselves or others. *See People v. Wetmore,* 22 Cal.3d 318, 583 P.2d 1308, 149 Cal.Rptr. 265 (1978); Wesson, *Mens Rea and the Colorado Criminal Code,* 52 U.Colo. L.Rev. 167, 200 (1981).

9. The legislature also has recognized the utility of such evidence. Section 16–8–107(2), C.R.S. 1973 (1978 Repl.Vol. 8), provides:

"In any trial or hearing concerning the defendant's mental condition, physicians and other experts may testify as to their conclu-

sions reached from their examination of hospital records, laboratory reports, X-rays, electroencephalograms, and psychological test results if the material which they examined in reaching their conclusions is produced at the time of the trial or hearing."

## C.

In approving the admissibility of mental impairment evidence by psychiatric or psychological experts in order to negate the culpability element of a crime, we recognize a significant distinction between this type of evidence and evidence of self-induced intoxication. Mental impairment evidence is evidence of a mental disease or defect which affects the defendant's cognitive or volitional faculties to the point of rendering him incapable of entertaining the *mens rea* for the crime charged against him. *See, e.g., People v. Gallegos, supra; People v. Ledman, supra; People v. Cruz,* 26 Cal.3d 233, 605 P.2d 830, 162 Cal.Rptr. 1 (1980); *State v. Neel,* 177 Mont. 93, 580 P.2d 456 (1978). Such a condition will generally result from unconscious processes beyond the actor's control. *People v. Gallegos, supra; People v. Ledman, supra.* Self-induced intoxication, on the other hand, refers to a disturbance of mental or physical capacities caused by substances *knowingly* introduced into the body, which the defendant *knows* or *ought to know* have the tendency to cause the resulting disturbance. Section 18–1–804(5), C.R.S.1973 (1978 Repl. Vol. 8).

In *People v. DelGuidice,* 199 Colo. 41, 606 P.2d 840 (1979), we held that self-induced intoxication was not an affirmative defense to second degree murder and, therefore, evidence of voluntary intoxication was not admissible to negate the culpability element of "knowingly" for that offense. Our decision echoed the legislative policy reflected in section 18–1–804(1), C.R.S.1973 (1978 Repl.Vol. 8), which provides that the voluntary intoxication of an accused is not a defense to a criminal charge, except to negate a specific intent when that intent is an element of the charge. Reinforcing this policy was section 18–3–103(2), C.R.S.1973 (1978 Repl.Vol. 8), which expressly excludes self-induced intoxication as an affirmative defense to second degree murder. An examination of the components of self-induced intoxication points up the basis for this legislative policy and the reasons for our decision in *DelGuidice.*

The concept of self-induced intoxication, by definition, requires that the defendant be aware at the outset that the substance he is about to ingest may affect his mental faculties. It is a matter of common knowledge that the excessive use of liquor or drugs impairs the perceptual, judgmental and volitional faculties of the user. Also, because the intoxication must be "self-induced," the defendant necessarily must have had the conscious ability to prevent this temporary incapacity from coming into being at all. Self-induced intoxication, therefore, by its very nature involves a degree of moral culpability. The moral blameworthiness lies in the voluntary impairment of one's mental faculties with knowledge that the resulting condition is a source of potential danger to others. *See generally* Model Penal Code § 208, Comment 3 (Tent. Draft No. 9, 1959). It is this blameworthiness that serves as the basis for *DelGuidice's* rule of exclusion.[10] Thus, when a defendant chooses to knowingly introduce intoxicants into his body to the point of becoming temporarily impaired in his powers of perception, judgment and control, the policy enunciated in *DelGuidice* prohibits him from utilizing his intoxication as a defense to crimes requiring the *mens rea* of "knowingly," "willfully," "recklessly" or "with criminal negligence." There is nothing in *DelGuidice,* however, that is inconsistent with permitting a defendant to contest these culpability elements by evidence of a mental impairment caused by a known mental disease or defect, or by other evidence of an incapacity not directly caused by self-induced intoxication.[11] Nor does *DelGuidice* prohibit evidence of voluntary intoxication to disprove the defend-

**10.** Involuntary intoxication, in contrast, is without moral culpability and, for this reason, is a complete defense to all crimes. Section 18–1–804(3), C.R.S.1973 (1978 Repl.Vol. 8), provides:

"A person is not criminally responsible for his conduct if, by reason of intoxication that is not self-induced at the time he acts, he lacks capacity to conform his conduct to the requirements of the law."

**11.** By way of example, in addition to evidence

ant's commission of the proscribed act by showing, for example, that he was comatose and hence incapable of any physical activity. *See generally* R. Perkins, *Criminal Law* at 900 (2d ed. 1969).

Obviously, the policy considerations underscoring *DelGuidice's* rule of exclusion are not present here. There is no moral culpability attaching to a mental affliction. Unlike voluntary drunkenness, a mental impairment such as minimal brain dysfunction is not a condition that may be induced or avoided by conscious choice. In other words, a mental disease or defect does not involve the consciously induced state of cognitive or volitional impairment upon which *DelGuidice* was premised. And last, in contrast to *DelGuidice,* which did not foreclose a defendant from contesting his culpability by evidence unrelated to his voluntary intoxication, the trial court's exclusion of all mental impairment evidence in this case eliminated any meaningful opportunity for the defendant to contest the *mens rea* of the crime. When we consider the character of the proffered evidence—expert opinion evidence of a mental disease or defect which significantly affected the defendant's capacity to act with the culpability that was basic to the state's right to hold him criminally responsible at all—we cannot reconcile the per se exclusion of such evidence with the basic due process rights of the criminally accused.

## IV.

The People claim that even if the trial court erred in its ruling prohibiting the admission of mental impairment evidence to negate culpability, the error is nonetheless harmless due to the tenuous character of the defendant's offer of proof with respect to the proffered evidence. We disagree with the People's contention.

The trial court's exclusion of this evidence was not based on some alleged inadequacy in the defendant's offer of proof but on a statutory construction which

created a per se exclusion of mental impairment evidence in all prosecutions not involving specific intent crimes., Moreover, the exclusion of the defendant's proffered evidence was an error of constitutional dimension. Last, the effect of the trial court's ruling was to deprive the defendant of any opportunity to controvert the prosecution's evidence on the only issue he was contesting—whether he acted with the requisite culpability of "knowingly" or "recklessly." In view of the constitutional nature of the error and the significance of the culpability issue to the ultimate finding of guilt, we cannot deem this error harmless beyond a reasonable doubt. *E.g., Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *People v. Hardin,* 199 Colo. 229, 607 P.2d 1291 (1980).

The judgment is reversed and the cause is remanded to the district court with directions to return the case to the county court for a new trial in accordance with the views herein expressed.

---

of a mental disease or defect, evidence of involuntary intoxication would be admissible. Section 18–1–804(3), C.R.S.1973 (1978 Repl.Vol. 8). Also admissible would be evidence of intoxication caused by substances introduced

into the body "pursuant to medical advice or under circumstances that would afford a defense to a charge of crime." Section 18–1–804(5), C.R.S.1973 (1978 Repl.Vol. 8).