The **PEOPLE** of the State of Colorado, Plaintiff-Appellee,

v.

Jerry **QUICK**, Defendant-Appellant.

No. 83SA446.

Supreme Court of Colorado, En Banc.

Jan. 31, 1986.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Dolores S. Atencio, Asst. Atty. Gen., Denver, for plaintiff-appellee.

R.D. Jorgensen, Pueblo, for defendant-appellant.

KIRSHBAUM, Justice.

The defendant, Jerry Quick, appeals his convictions of two counts of felony theft[1] and one count of second degree forgery[2] following a trial to the court. We affirm.[3]

In 1981, the defendant was a licensed attorney residing in La Junta, Colorado. He was retained by Lowell Seberson and Marvin Williams to represent them at a closing of a sale of a motel they owned.

---

1. Section 18–4–401, 8 C.R.S. (1978). This statute has been amended. *See* § 18–4–401, 8 C.R.S. (1985 Supp.).

2. Section 18–5–103, 8 C.R.S. (1978).

3. Because the defendant asserts that § 18–4–401 as applied to him in this case is unconstitutional, the appeal has been transferred to this court. *See* §§ 13–4–102(1)(b), –110(1)(a), 6 C.R.S. (1973).

The closing occurred during the first week of January 1981. In connection with the transaction, Seberson and Williams were obligated to provide a title insurance commitment for the property. While seeking to obtain such insurance, the defendant informed his clients that as a condition to issuing a policy the title insurance company required Seberson and Williams to place the sum of $20,000 in an interest-bearing trust account to cover a cloud on the title to the property.[4] On January 3, 1981, Seberson and Williams gave a $20,000 check to the defendant for this purpose. The defendant agreed to hold the amount in trust for his clients in an interest-bearing account. However, the check was deposited into the defendant's own individual trust account (the I.T.A. Fund) at the Colorado Bank and Trust in La Junta and was depleted by March of 1981 as the result of checks written by the defendant.

In the summer of 1981, Seberson asked the defendant about the $20,000 and was told by the defendant that the money had been placed in a treasury bill in Pueblo, Colorado. Seberson again contacted the defendant in December 1981, and was informed that the money had been placed in a treasury bill in Denver. In February of 1982, the defendant informed Seberson and Williams that he had spent the money.

During 1981, the defendant, Robert Travis and Patricia Haberman were co-trustees of the Katherine Warnock Trust (the Trust). A portion of the Trust corpus was held in a bank account at the Heritage Savings and Loan Association (Heritage) in Lamar, Colorado. The signatures of all three co-trustees were required for any withdrawal from the Heritage Trust account.

On December 3, 1981, the entire balance of the Heritage Trust account, $42,656.19, was withdrawn in the form of a check made payable to "Jerry Quick, Trustee." The withdrawal slip contained the signature of the defendant and the purported signatures of Travis and Haberman. However, Travis and Haberman neither signed the slip nor authorized the withdrawal of the funds. On the same day, December 3, 1981, the defendant deposited $42,156.19 into his I.T.A. Fund and retained $500 in cash from the proceeds of the transfer of the Trust funds. The defendant subsequently wrote several checks on his I.T.A. Fund until it was closed out in March of 1982. In January of 1982, the defendant informed Travis and Haberman of his misconduct. The trial resulting in the defendant's convictions ensued.

At trial, the defendant did not challenge the allegations that he had committed the acts necessary for convictions of the offenses of theft and second degree forgery. Rather, he contended that at the time he performed those acts he lacked the capacity to form the culpable mental states required for conviction of such offenses.

Four psychiatrists testified in support of his defense of impaired mental condition.[5]

---

4. The record does not disclose whether the escrow of this $20,000 sum was in fact a condition required by the title insurance company prior to issuance of its policy.

5. Section 18–1–803, 8 C.R.S. (1978), provided that "[e]vidence of an impaired mental condition though not legal insanity may be offered in a proper case as bearing upon the capacity of the accused to form the specific intent if such an intent is an element of the offense charged." Impaired mental condition is an affirmative defense, § 18–1–805, 8 C.R.S. (1978), requiring the prosecution to prove a defendant's guilt as to that issue beyond a reasonable doubt in addition to proving the elements of the offense. § 18–1–407(2), 8 C.R.S. (1978). While we have held that the affirmative defense of impaired mental condition may be limited to specific

intent crimes, *People v. Ledman,* 622 P.2d 534 (Colo.1981), a defendant can offer impaired mental condition evidence to contest the culpability requirement for non-specific intent crimes, *Hendershott v. People,* 653 P.2d 385 (Colo.1982), cert. denied, 459 U.S. 1225, 103 S.Ct. 1232, 75 L.Ed.2d 466 (1983).

The operation and effect of the impaired mental condition defense was significantly altered subsequent to the defendant's conviction. *See* Ch. 188, sec. 2, § 16–8–102, sec. 3, § 16–8–103.5, sec. 11, § 18–1–803, 1983 Colo.Sess.Laws 672, 673–74, 677 (codified at §§ 16–8–102, –103.5, 18–1–803, 8 C.R.S. (1985 Supp.)). Mental impairment evidence now may be offered in a proper case "as bearing on the capacity of the accused to form the culpable mental state which is an element of the offense charged." § 18–1–

All four diagnosed the defendant as having a bipolar disorder[6]—a mental condition also termed manic-depressive defect or disease—during 1981. Each physician also testified that in his opinion the defendant, as a result of this disorder, then had a delusional belief that God had directed him to provide financial assistance to persons in the La Junta area, and that this delusion motivated the conduct in question.[7] Three of the psychiatrists also testified that in their opinions the defendant, due to his mental disorder, was unable to form the culpable mental states of "knowingly" and "intent" as required for commission of the offenses of theft and second degree forgery as they understood the applicable legal definitions.

The trial court concluded that the defendant did have the requisite culpable mental state of intent and knowing conduct at the time the conduct occurred. Although it found that the defendant suffered from the bipolar syndrome described by the medical experts, the trial court concluded that the circumstantial evidence adduced by the People was sufficient to establish the requisite *mens rea* for the three offenses

charged. The trial court also stated that some of the medical experts appeared to have confused the legal definition of "insanity" with the legal definitions of "intent" and "knowing" conduct, and expressed a concern that the issue of insanity not become a standard question for resolution in every case in which a not guilty plea is entered.

The defendant urges the following grounds for reversal of his convictions: (1) the provisions of section 18–4–401(1), 8 C.R.S. (1978), defining theft are unconstitutional as applied to the defendant; (2) the trial court erred in failing to apply the proper *mens rea* requirement to the two theft counts; (3) the trial court erroneously rejected evidence that the defendant could not appreciate the wrongfulness of his conduct; and (4) the trial court's verdict was not supported by the evidence.

I

The defendant contends that, as applied, section 18–4–401, 8 C.R.S. (1978), violates his constitutional rights to equal protection and due process of law.[8] Insofar as the of-

---

803, 8 C.R.S. (1985 Supp.). If a defendant intends to assert the affirmative defense of impaired mental condition, he must indicate his intention to the court and the prosecution. § 16–8–103.5(1), 8 C.R.S. (1985 Supp.). Successful application of the affirmative defense will result in commitment of the defendant to the Department of Institutions, § 16–8–103.5(5), and his eligibility for release therefrom is determined under the standards provided in §§ 16–8–115 and 16–8–120, 8 C.R.S. (1985 Supp.). These statutory changes in the impaired mental condition defense are not before us on this appeal.

6. Bipolar disorder is listed in the diagnostic nomenclature of psychiatry as a mood or affective disorder. Its essential features involve polaric shifts in an individual's mood and behavior from episodes of mania to depression. In the manic episode of the disorder, an individual's predominant mood is elevated, expansive or irritable. Symptoms of the manic episode include "hyperactivity, pressure of speech, flight of ideas, inflated self-esteem, decreased need for sleep, distractibility, and excessive involvement in activities that have high potential for painful consequences which is not recognized." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 206 (3rd

ed. 1980). The symptom of inflated self-esteem can range from "uncritical self-confidence to marked grandiosity, which may be delusional ... [g]randiose delusions involving a special relationship to God or some well-known figure from the political, religious, or entertainment world are common." *Id.* at 207. The essential feature of the depressive episode of the disorder is depression or loss of interest in almost all usual activities and pastimes. Symptoms of the depressive episode include sleep disturbance, decreased energy, feelings of worthlessness or guilt, and thoughts of death or suicide. *Id.* at 210.

7. The physicians testified that the defendant related to them that he had attempted to help certain individuals in the La Junta area. Both Drs. Dubovsky and Austin also testified to the effect that it would be consistent with the defendant's mental disorder for him to have used the subject funds for office expenses which, to the defendant, would appear necessary to permit him to carry out his mission.

8. U.S. Const. amend. XIV states in pertinent part as follows:

No State shall ... deprive any person of life, liberty, or property without due process of

fenses charged in Counts 1 and 2 of the information are concerned, the pertinent provisions of the statute contain the following language:

(1) A person commits theft when he knowingly obtains or exercises control over anything of value of another without authorization, or by threat or deception, and:

(a) Intends to deprive the other person permanently of the use or benefit of the thing of value; or

(b) Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit; or

(c) Uses, conceals, or abandons the thing of value intending that such use, concealment, or abandonment will deprive the other person permanently of its use and benefit....

§ 18–4–401(1), 8 C.R.S. (1978).

At trial, the prosecution elected to proceed under subsection (1)(b) of the statute. The defendant asserts that subsection (1)(b) proscribes the identical conduct prohibited by subsection (1)(c), and that, therefore, no rational or articulable distinction can be drawn between the two subsections to warrant proof of the lesser culpable mental state of "knowingly" under subsection (1)(b) while requiring proof of "intending" under (1)(c). The defendant also asserts the prosecution's election to proceed under subsection (1)(b) impermissibly precluded him from utilizing the affirmative defense of impaired mental condition with regard to general intent offenses of theft,[9] in effect impermissibly reducing the prosecution's burden of proof. The defendant's arguments are without merit.

■ A statute may be found to violate the constitutional guarantee of equal protection of the laws when it is found to proscribe the same conduct prohibited by another statute and imposes a different sanction than the other statute provides. *See, e.g., People v. Aragon*, 653 P.2d 715 (Colo.1982); *People v. Marcy*, 628 P.2d 69 (Colo.1981); *People v. Taggart*, 621 P.2d 1375 (Colo.1981); *People v. Bramlett*, 194 Colo. 205, 573 P.2d 94 (1977), *cert. denied*, 435 U.S. 956, 98 S.Ct. 1590, 55 L.Ed.2d 808 (1978). Under the theft statute, the gradation of criminal penalties for the offense is according to the value of the thing taken in the theft. *See* § 18–4–401(2), 8 C.R.S. (1978). Because each theft herein involved an amount of ten thousand dollars or more, each act is classified as a class 3 felony and carries a presumptive sentence of four to eight years plus one year of parole. *See* § 18–4–401(2)(d), 8 C.R.S. (1978); § 18–1–105(1)(a)(I), 8 C.R.S. (1985 Supp.). The defendant was thus subject to the same criminal sanctions whether the prosecution proceeded under subsection (1)(b) or (1)(c). No disparate penalties are involved here. This court has previously held that a penal statute containing alternative culpable mental state elements represents a legitimate legislative decision that whether the crime is committed "with intent" or "knowingly," the act is equally heinous in the eyes of the law and deserving of similar punishment. *Aragon*, 653 P.2d 715. Thus, no legitimate equal protection issue is implicated by the provisions of the theft statute considered here.

■ We also reject the defendant's contention that the prosecution's election to proceed under section 18–4–401(1)(b) denied

---

law, nor deny to any person within its jurisdiction the equal protection of the laws.

Colo. Const. art. II, § 25, states as follows: No person shall be deprived of life, liberty or property without due process of law.

The right to equal protection of the laws is included within article II, section 25, of the Colorado Constitution. *Heninger v. Charnes*, 200 Colo. 194, 613 P.2d 884 (1980).

**9.** The General Assembly has designated all crimes in which the mental culpability require-

ment is expressed as "knowingly" or "willfully" as general intent offenses. § 18–1–501(6), 8 C.R.S. (1978). Section 18–1–501(5), 8 C.R.S. (1978), provides that all crimes in which the mental culpability requirement is expressed as "intentionally" or "with intent" are declared to be specific intent offenses. Section 18–1–803, 8 C.R.S. (1978), provides that impaired mental condition is an affirmative defense only to specific intent crimes.

the defendant due process of law by precluding the defendant from utilizing the affirmative defense of impaired mental condition with regard to the two counts of theft. In *People v. Ledman*, 622 P.2d 534 (Colo.1981), we rejected a similar due process attack on the impaired mental condition defense statute, section 18–1–803, 8 C.R.S. (1978). In *Ledman*, we noted that

> Whereas the legislature ... may limit the range of criminal responsibility by establishing affirmative defenses, it also may limit those affirmative defenses to a particular category of crimes without offending due process. Due process requires only that the limitation not impair basic rights of the criminally accused. The limitation of the affirmative defense of impaired mental condition to specific intent crimes is a reasonable exercise of legislative power.

*Id.* at 539 (citation omitted).

We view the defendant's due process challenge to section 18–4–401(1)(b) to be in substance the same challenge we rejected in *Ledman*. Moreover, the trial court did not limit the testimony of the defendant's expert witnesses to the specific intent crime for which he was charged. The doctors' testimony was also admitted and considered for the purpose of contesting the *mens rea* element for the crimes of theft—general intent offenses as prosecuted in this case. Due process requires no more. *See Hendershott v. People*, 653 P.2d 385 (Colo.1982), *cert. denied*, 459 U.S. 1225, 103 S.Ct. 1232, 75 L.Ed.2d 466 (1983); *People v. Morgan*, 637 P.2d 338 (Colo.1981).

## II

The defendant contends that the trial court erred in concluding that knowing conduct is the culpable mental state applicable to the two counts of theft charged in the information. He argues that each of the offenses of theft by deception defined by section 18–4–401 requires proof of the culpable mental state of specific intent, *i.e.*, the intent to defraud.[10] We do not agree with this argument.

Section 18–4–401 reflects the General Assembly's decision to consolidate under one broad statutory framework such crimes as larceny, embezzlement, confidence games and obtaining goods or services by false pretense. § 18–4–403, 8 C.R.S. (1978); *see White v. People*, 172 Colo. 271, 472 P.2d 674 (1970). Most of the offenses now encompassed within section 18–4–401 were among the earliest offenses known to the common law and required proof of some form of *mens rea*, or guilty mind. *See* Mueller, *On Common Law Mens Rea*, 42 Minn.L.Rev. 1043, 1101 (1955). Section 18–4–401 also requires proof of a culpable mental state as well as proof of prohibited conduct for conviction of any of the offenses enumerated therein. *See Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *People v. Bridges*, 620 P.2d 1 (Colo.1980).

The defendant relies on language from this court's decision in *People v. Piskula*, 197 Colo. 148, 595 P.2d 219 (1979), to support his assertion that the requisite culpable mental state for any form of the offense of theft by deception is specific intent. In *Piskula*, we held that the defendant's prosecution for theft by deception would not violate this state's constitutional prohibition of imprisonment for civil debt, Colo. Const. art. II, sec. 12, because in consideration of the particular facts alleged in that case, an intent to defraud would have to be proven in order to sustain a conviction. In *Piskula*, we referred to *Sandoval v. People*, 176 Colo. 414, 490 P.2d 1298 (1971), as requiring the *mens rea* of intent to deprive permanently in theft prosecutions, and then made the following general statement upon which the defendant now relies: "[w]hen the means used to perpetrate this theft are those of deception,

---

10. In the Bill of Particulars filed in this case, the prosecution stated that it would proceed under the theory that as to the first theft count, the defendant knowingly exercised control over the property of his two clients by deception. As to the second theft count, the prosecution stated that it would proceed under the theory that the defendant knowingly exercised control over the property of the Trust without authorization and by deception.

the requisite mental state is necessarily the intent to defraud." *Piskula,* 197 Colo. at 151, 595 P.2d at 221. In reaching our result in *Piskula,* we also relied on this court's decision in *People v. Ingersoll,* 181 Colo. 1, 506 P.2d 364 (1973). Close consideration of these three cases does not support the defendant's sweeping suggestion that all theft prosecutions require proof of intent to permanently deprive and that all theft by deception prosecutions require proof of intent to defraud.

*Sandoval* involved a prosecution for burglary and attempted theft. In rejecting the argument that the defendant was entitled to an instruction on joyriding as a lesser-included offense of attempted theft, we noted that while the offense of joyriding required an unauthorized taking of an automobile for the purpose of temporarily depriving the owner thereof, *see* C.R.S. 1963, § 13–3–2, an essential element of theft as defined by the applicable statute, C.R.S. 1963, § 40–5–2 (1967 Perm.Supp.),[11] "is the formation of an intent to *permanently* deprive the owner of his property." *Sandoval,* 176 Colo. at 418, 490 P.2d at 1300 (emphasis in original). This general reference to the requisite mental state for the offense of theft alluded only to prosecutions under the provisions of the theft statute which expressly required proof of specific intent to permanently deprive for conviction. *See* C.R.S. 1963, § 40–5–2(1)(c)(i). *Sandoval* involved such a prosecution. The *Sandoval* decision in no way mandates that every offense of theft defined by the General Assembly requires proof of specific intent to deprive permanently, nor does it prohibit the General Assembly from adopting alternative mental culpability elements in defining such offense.

In *Ingersoll,* we rejected the defendant's argument that an information alleging felony theft under C.R.S. 1963, section 40–5–2, was insufficient for failing to allege that the offense was committed with specific intent. We noted that "the several elements (such as specific intent) must ... be proved at trial." *Ingersoll,* 181 Colo. at 3, 506 P.2d at 365. However, the jury in that case was instructed that theft occurs when a person knowingly obtains unauthorized control over another's property and intends to deprive the owner permanently *or* knowingly uses, conceals or abandons the property in such manner as to deprive the owner permanently. Thus, the defendant in *Ingersoll* could have been convicted of theft if he committed the offense with the culpable mental state of knowing conduct provided in C.R.S. 1963, § 40–5–2. The case does not support the argument that all thefts require proof of specific intent or that all thefts by deception require proof of intent to defraud.

Neither *Sandoval* nor *Ingersoll* attempts to construe the provisions of the former theft statute equivalent to that portion of section 18–4–401(1) which proscribes theft by deception. In *People v. Norman,* 703 P.2d 1261 (Colo.1985), we stated that "the offense of theft by deception requires proof that misrepresentations made to the victim caused the victim to part with something of value in reliance upon those misrepresentations." *Id.* at 1268; *see People v. Ferrell,* 197 Colo. 253, 591 P.2d 1038 (1979). While *Norman* discusses types of conduct which may constitute deception, it

---

11. C.R.S. 1963, § 40–5–2 (1967 Perm.Supp.), provided in pertinent part:

(1)(a) Any person commits theft when he knowingly:

(b)(i) Obtains or exerts unauthorized control over anything of value of another; or

(ii) Obtains by deception control over anything of value of another; or

(iii) Obtains by threat control over anything of value of another; or

(iv) Obtains control over any stolen thing of value knowing the thing of value to have been stolen by another; and

(c)(i) Intends to deprive another permanently of the use or benefit of the thing of value; or

(ii) Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive another permanently of such use or benefit; or

(iii) Uses, conceals, or abandons the thing of value intending that such use, concealment, or abandonment will deprive another permanently of such use or benefit.

does not imply that all misrepresentations actionable as theft require proof of the singular culpable mental state of intent to defraud. None of our decisions support the defendant's broad reading of *Piskula*. We conclude that the General Assembly has established alternative mental state requirements for the offense of theft by deception. To the extent language in *Piskula* lends itself to a contrary conclusion, such language is hereby qualified.

Section 18–4–401 provides that the requisite elements of the offense of theft are knowing control over the property of another either without authorization or by threat or deception and one of the types of mental culpability as set forth in subsections (1)(a), (b) and (c) of the statute. *People v. Treat*, 193 Colo. 570, 568 P.2d 473 (1977). The particular culpable mental state adopted by the General Assembly in section 18–4–401(1)(b), contrary to the defendant's assertion, is that of knowing conduct. *Id.* Upon its election to proceed against the defendant under subsection (1)(b) of the statute, as amplified by the response to the defendant's bill of particulars, the prosecution was required to prove initially that, with respect to the first count, the defendant knowingly gained control over a thing of value by deception and, with respect to the second count, that the defendant knowingly gained control over a thing of value by deception or without authority. In addition, the prosecution was required to prove that the defendant knowingly used or concealed a thing of value in such manner as to deprive the owner permanently of the use or benefit thereof. The determination that in some circumstances the offense of theft by deception may require proof only of a culpable mental state of knowing conduct rather than of specific intent represents an appropriate exercise of the General Assembly's power to establish the legal components of criminal offenses. *Hendershott*, 653 P.2d 385. Therefore, the trial court correctly concluded that proof of knowing conduct satisfied the culpable mental state requirement for the two counts of theft with which the defendant was charged.

## III

The defendant also contends that the trial court erroneously failed to consider evidence to the effect that the defendant was unable to appreciate the wrongfulness of his acts and was incapable of distinguishing right from wrong at the time the criminal acts took place. Stating as his premise that the trial court concluded that such evidence was not relevant to the issue of impaired mental condition, the defendant concludes that the trial court erroneously ruled that such evidence would be relevant only if the issue of the defendant's sanity had been raised. We do not agree that the trial court failed to consider the evidence in question.

Under section 18–1–803, 8 C.R.S. (1978), a person accused of a specific intent crime is entitled to present evidence of any impaired mental condition to establish that the accused was incapable of forming the culpable mental state of specific intent. *Ledman*, 622 P.2d 534. If a defendant introduces some credible evidence on the issue, the prosecution is required to establish beyond a reasonable doubt that such defendant had the capacity to form the requisite specific intent as well as to establish its burden of proof on all other essential elements of the offense. § 18–1–407(2), 8 C.R.S. (1978); *see Hendershott*, 653 P.2d at 392 n.5.

In *Hendershott*, 653 P.2d 385, we held that evidence of impaired mental condition may also be admissible to establish a defendant's inability to form the requisite culpable mental state in cases involving non-specific intent offenses. We concluded that a rule prohibiting such evidence in non-specific intent offense cases would in effect establish an impermissible presumption of culpability in those cases, in derogation of the presumption of innocence and of the constitutional requirement of prosecutorial proof of all material elements of an alleged offense beyond a reasonable doubt. *Id.* at 391.

In its final ruling, the trial court stated that this case did not require adjudication

of the issue of the defendant's sanity.[12] That statement was accurate. The trial court also observed that the evidence of mental disease or defect introduced by the defendant was properly admitted on the issue of impaired mental condition and further stated that the question to be resolved was whether the prosecution had satisfied its burden of establishing the requisite culpable mental state for conviction of the alleged offenses. Finally, the trial court actually found that the defendant suffered from bipolar disorder. These comments by the trial court indicate that it not only considered all of the expert opinion evidence introduced by the defendant, but to a great extent accepted it.

The trial court was not, however, persuaded by the testimony of the expert witnesses that because the defendant suffered from this mental disorder he could not have formed the culpable mental states necessary for convictions of the alleged offenses. This ultimate decision was within the discretion of the trial judge in its role of fact finder. *Hendershott*, 653 P.2d 385. The trial court stated its opinion that the People had introduced sufficient circumstantial evidence to establish the requisite culpable mental state beyond a reasonable doubt; as indicated in part IV of this opinion, we have no basis to reject the trial court's evaluation of the evidence in this respect. The defendant's assertion that the trial court "rejected" the opinion evidence of the expert witnesses is without merit.

The trial court stated that possibly two of the doctors had construed the legal definition of "knowingly" and "with intent" to include necessarily the capacity to be aware of the wrongfulness of the proscribed conduct—a concept admittedly inherent in the legal definition of insanity.[13] The trial court also observed that the legislative definitions of the culpable mental states of specific intent and knowing conduct contain no indication that a person's awareness that particular conduct is right, wrong or "criminal" is germane to a determination of whether such person possessed either of those culpable mental states at a particular moment. The defendant relies on these comments for support of his argument that the trial court failed to consider the evidence of impaired mental condition introduced by the defendant at trial. We do not so construe the trial court's comments.

Dr. Dubovsky testified that in his opinion the defendant thought that he was following God's direction in obtaining the money and that the defendant did not feel and did not know that he was depriving anyone of this money. Dr. Dubovsky also testified that he relied only on the defendant's recollection of the circumstances surrounding the events giving rise to the criminal charges to form his opinion. The doctor did not ascertain whether the defendant actually spent the money in accordance with the described delusion. Dr. Dubovsky described all persons with the bipolar mental disorder suffered by the defendant as

---

**12.** Section 16-8-103(1), 8 C.R.S. (1978), provides that

> [t]he defense of insanity may only be raised by a specific plea entered at the time of arraignment; *except that the court for good cause shown may permit the plea to be entered at any time prior to trial.*

The defendant did not at any time tender an insanity plea.

**13.** Section 16-8-101, 8 C.R.S. (1978), provided the following test for insanity:

> A person who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act, or being able so to distinguish, has suffered such an impairment of mind by disease or defect as to de-

stroy the willpower and render him incapable of choosing the right and refraining from doing the wrong is not accountable; and this is so howsoever such insanity may be manifested, by irresistible impulse or otherwise.

The insanity test in § 16-8-101 was amended subsequent to the defendant's conviction and now provides as follows:

> A person who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act is not accountable. . . .

*See* Ch. 188, sec. 1, § 16-8-101, 1983 Colo.Sess. Laws 672, 672; ch. 119, sec. 1, § 16-8-101, 1984 Colo.Sess. Laws 490, 490.

"crazy," stated that the defendant's emotional component changed from time to time and testified that at the time the defendant obtained the money from Heritage he was aware that he had no authority to sign the names of the other co-trustees to the withdrawal request.

Dr. Austin testified that in his opinion the defendant was not capable of entertaining the culpable mental state required for the theft offenses because of the presence of the bipolar syndrome. Dr. Austin stated that he felt the defendant did not perceive his acts to be criminal, was not capable of forming the intent to deprive anyone of anything and was not aware that his conduct could be considered wrong. He also stated that the defendant did not have the intent to defraud required for the forgery count and further testified that although the defendant was not able to relate how the money was spent, the money probably had been spent in accordance with the defendant's delusion. On cross-examination, Dr. Austin stated that although "crazy," the defendant was not crazy in every sphere of his life, and that the defendant was aware of the true owners of the money when he conducted the subject transactions.

Dr. Roberts testified that in his opinion the defendant was not able to entertain the culpable mental state of knowingly at the time the alleged theft offenses occurred. Stating that in his view the mental state "knowingly" included an affective element as well as a cognitive element, the doctor ventured his opinion that a person cannot commit a criminal act knowingly unless he has an awareness at the emotional level that the act is wrong. Dr. Roberts felt that at the time of the alleged thefts the defendant would not be aware that his conduct would be considered criminal because the defendant's motive for the thefts was his delusional belief that he was doing God's will. On the same basis, the doctor concluded that the defendant could not have entertained the intent to defraud required for the forgery charge. On cross-examination, Dr. Roberts stated that at the time of these events the defendant was aware of the physical forgery and, "in the legal sense," was aware that he lacked authority to spend the money.

All three of these doctors testified that with regard to the $20,000 entrusted to the defendant, the defendant was aware that he did not have the authority to spend the money and was aware that he was spending the money. Regarding the events surrounding the offenses involving the Trust, the cross-examinations of these three doctors established that the defendant was aware (1) of his co-trustee status with regard to the Trust, (2) of the need for obtaining the three co-trustees' signatures before funds could be withdrawn from the Heritage account, (3) that he had no authority to sign the names of the other co-trustees to a withdrawal slip for the Heritage account, (4) that the money withdrawn from the Heritage account belonged to the Trust, (5) that he had no authority to withdraw the funds, (6) that he had taken the funds and deposited them in his own bank account, and (7) that he had spent the money.

The power to define criminal conduct and to establish the legal components of criminal liability is vested with the General Assembly. *Hendershott*, 653 P.2d 385. The General Assembly has defined the mental element of "with intent" as a conscious objective to cause a specific result proscribed by statute. § 18–1–501(5), 8 C.R.S. (1978). It has also declared that a person acts "knowingly" when, with respect to conduct or circumstances described by a statute, he is aware that his conduct is of such a nature or that such circumstances exist or, with respect to a probative result, he is aware that his conduct is practically certain to cause the result. § 18–1–501(6), 8 C.R.S. (1978). Neither definition contains an element of awareness or appreciation of the wrongfulness of the proscribed conduct or result.

To the extent that the doctors' conclusions that the defendant could not entertain the culpable mental states required by statute for conviction of the offenses charged

were based on an assumption that the defendant's inability to appreciate the wrongfulness of his conduct automatically vitiated the legal *mens rea* requirements for these offenses, the doctors employed an erroneous legal standard.

The trial court's discussion of the different legal standards, rather than indicating a decision to ignore the testimony of the expert witnesses, reveals a careful analysis of that testimony and indicates one basis for the exercise of its discretion to reject the opinions of those witnesses. The trial court in essence described the different legal standards, articulated by the General Assembly, which define concepts of various mental states in a manner that is appropriate to the purposes of the criminal justice system. Whether such definitions reflect the opinions of medical experts concerning better or more scientifically acceptable concepts of explanations for human behavior is, as the trial court indicated, immaterial.[14] Far from evidencing any disregard of the testimony of the expert witnesses, these comments of the trial court reveal a careful analysis of such testimony and an effort to articulate one basis for the decision not to adopt the defendant's interpretation of the significance of such evidence.

## IV

The defendant also argues that the evidence was not sufficient to support his convictions in view of the fact that the prosecution failed to introduce expert testimony or other rebuttal evidence to refute the testimony of four physicians who testified in effect that in their opinions the defendant could not have formed the culpable mental states required for the offenses of theft and second degree forgery at the time the alleged offenses occurred. We disagree.

Challenges to the sufficiency of the evidence to support a criminal conviction require a reviewing court to determine whether the evidence, when viewed as a whole and in a light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable person that the defendant is guilty of the crime beyond a reasonable doubt. *People v. Aalbu,* 696 P.2d 796 (Colo.1985); *People v. Brassfield,* 652 P.2d 588 (Colo.1982). In making these determinations, it must be kept in mind that it is for the fact finder to decide "the difficult questions of witness credibility and the weight to be given conflicting items of evidence." *Brassfield,* 652 P.2d at 592.

The crime of second degree forgery requires the prosecution to prove that the defendant committed the acts proscribed by section 18–5–103, 8 C.R.S. (1978), "with the intent to defraud." This offense, therefore, requires proof of specific intent. Because the defendant presented evidence in support of his affirmative defense of impaired mental condition, the prosecution was obligated to prove beyond a reasonable doubt that the defendant had the capacity to form the intent to defraud. § 18–1–407(2), 8 C.R.S. (1978); *see Hendershott,* 653 P.2d at 392 n. 5. We do not agree with the defendant's assumption that failure to introduce expert opinion evidence concerning a defendant's mental state requires en-

**14.** During his testimony, Dr. Roberts alluded to the interface between legal and psychiatric approaches to the problem of explaining human behavior as follows:

The term "knowingly", of course, is a legal term, and it seems that it includes cognitive elements.

But it also must include affective elements. That is, for a person to know implies also that they know in the emotional sense what they are doing. The mind is not compartmentalized, so that that [sic] knowing is not isolated from the act, and the affect is a component.

A person may intellectually recognize, with some consideration given the type, that an act is criminal, but they may not appreciate that the act is wrong because the affective component, that is the mood elation component, interferes with their ability to rationally consider alternatives and consequences.

So although one is obliged to transfer legal concepts to some degree into psychological constructs, I think that it is applicable in this case because "knowing" must include an affective component because it's a nature of mind not to be compartmentalized and not to act as though it's only intellectual on any decision.

try of a judgment of acquittal when the defendant introduces such evidence.

To assess the sufficiency of the evidence, we must examine all of the evidence introduced at the trial, whatever its character, to determine whether the prosecution established beyond a reasonable doubt that the defendant committed the offense of second degree forgery and had the capacity to form the culpable mental state of specific intent necessary for conviction of second degree forgery. Admittedly, Dr. Roberts and Dr. Dubovsky opined that at the time of the acts alleged the defendant was not capable of forming the mental culpability element of "intent to defraud." However, Dr. Roberts testified on cross-examination that the defendant presented the forged withdrawal slip to bank agents for the purpose of obtaining the money in the Heritage account, and Dr. Dubovsky stated on cross-examination that at the time the defendant withdrew the money the defendant was aware that the signatures of the other co-trustees were needed on the withdrawal slip and that he, the defendant, did not have authority to sign their names. Furthermore, an expert document examiner testified that by comparing handwriting exemplars provided by the defendant [15] and the other co-trustees to the signatures on the withdrawal slip, he was of the opinion that the defendant's exemplar of his own signature and the signature of the defendant on the withdrawal slip were of common authorship while the signatures of the other co-trustees on the withdrawal slip were simulations—attempts to reproduce or draw another person's signature. This evidence provides ample basis for the conclusion beyond a reasonable doubt that at the time of the offense the defendant had the specific intent to defraud the Trust and Heritage. The doctors' testimony, the statements and conduct of the defendant and all the circumstances surrounding the forgery support the inference that the defendant did possess the requisite specific intent. *See People v. Taylor*, 655 P.2d 382 (Colo.1982); *People v. Becker*, 187 Colo. 344, 531 P.2d 386 (1975).

We are also satisfied from our examination of the record that there was substantial and sufficient evidence presented to permit a reasonable fact finder to find beyond a reasonable doubt that the defendant knowingly committed the two thefts with which he was charged. While the doctors' testimony was to the effect that the defendant could not form the *mens rea* of "knowingly" required for commission of the theft offenses, this evidence was offered only to contest the mental culpability issue. It was for the trial court, sitting as the fact finder, to determine what weight to give the conclusions reached by the defendant's expert witnesses. *See People v. Garner*, 187 Colo. 294, 530 P.2d 496 (1975); *People v. King*, 181 Colo. 439, 510 P.2d 333 (1973). On cross-examination, the doctors testified that the defendant was aware that the funds taken in the alleged thefts belonged to his clients and to the Trust; that he was aware of his lack of authority to spend or exercise control over the funds; and that he was aware that he had spent the money. Viewing all the evidence in a light most favorable to the prosecution, as we must, the record supports the trial court's conclusion that the defendant knowingly committed the acts of theft with which he was charged.

The judgment of the trial court is affirmed.

---

15. The defendant's handwriting exemplars were obtained pursuant to an order under Crim. P.

41.1.