**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JUNE 12, 2001**

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                                       No.  115617

JAMES A. CARPENTER,

    Defendant-Appellant.

_____

BEFORE THE ENTIRE COURT

YOUNG, J.

Defendant presented evidence at his bench trial that, although not legally insane, he lacked the mental capacity to form the specific intent required for the crimes of first-degree home invasion, MCL 750.110a(2), and felonious assault, MCL 750.82. The trial court found defendant guilty of both offenses, and the Court of Appeals affirmed.

We originally granted leave to consider whether the lower courts properly determined that it was defendant's burden to establish his diminished capacity defense by a preponderance of the evidence under MCL 768.21a. However, we are now persuaded by the prosecution's argument that, by enacting a comprehensive statutory scheme setting forth the requirements for and the effects of asserting a defense based on either mental illness or mental retardation, the Legislature has signified its intent not to allow a defendant to introduce evidence of mental abnormalities short of legal insanity to avoid or reduce criminal responsibility by negating specific intent.[1] Therefore, we affirm the decision of the Court of Appeals on that basis.

## I. Factual and Procedural Background

The events giving rise to defendant's convictions took place in the early morning of July 9, 1995. After attending a dance at a local community hall, complainants Audrey Thomas and Aron Blakely returned to Thomas' home in Saginaw at approximately 2:00 a.m.[2]

Thomas and Blakely were sitting in the family room when Thomas heard the doorbell ring. Thomas discovered that

---

[1]Defendant's motion to strike the prosecution's brief raising this issue is denied.

[2]Thomas and defendant previously had a long-term relationship. A child was the product of that relationship.

defendant was at the door. Defendant demanded to be let in, yelling that Blakely should "come on out" and that Thomas was his "woman." When Thomas refused to admit him, defendant eventually crashed through a window. Defendant produced a handgun and fired two shots in the general direction of Thomas and Blakely. Neither was hit. Blakely then announced that he was leaving. As defendant opened the door for him, defendant struck Blakely in the face with his fist. Although defendant initially walked out the front door with Blakely, he immediately returned to the house where he confronted Thomas, striking her head with the butt of his gun. The blow apparently caused the gun to discharge a third time. Blakely heard the shot and went next door to call the police.

Defendant eventually fled the scene and drove to his nearby home. He immediately called Thomas and threatened her. Several police officers arrived at defendant's home a short time later. A stand-off ensued, during which defendant threatened to shoot himself and any officers who attempted to enter the house. Saginaw Police Sergeant Terri Johnson-Wise established telephone contact with defendant and spoke with him several times. She testified that defendant was yelling and screaming initially, and that when he calmed down he began talking about demons and "money that was stolen from him."

At some point, defendant asked for some heart medication that was in his truck. Saginaw Police Officer Daniel Kuhn

3

lured him to a window by offering to give defendant his medication. When Officer Kuhn tried to grab defendant through the open window, defendant got free and slammed the window on Officer Kuhn's fingers. Defendant eventually allowed the officers to enter and he was placed under arrest. He was subsequently charged with first-degree home invasion, MCL 750.110a(2), two counts of assault with intent to commit murder, MCL 750.83, being a felon in possession of a firearm, MCL 750.224f, possession of a firearm during the commission of a felony, MCL 750.227b, and resisting and obstructing a police officer, MCL 750.479.

At his bench trial, defendant presented a diminished capacity defense. In addition to several lay witnesses that testified that he had been drinking before the incident and that he appeared intoxicated, defendant presented a report from Kingswood Hospital, where he had been treated approximately a month after the incident. The report described him as being "delusional" and indicated that he suffered from organic brain damage. The report further described his conduct upon admission to the hospital:

> He stated that his son had been killed in April 1995 and "they had broken into my computer." He says that he has special forces that are guarding him; that people are stealing money from his son's records. He also hears voices telling him that people are looking and laughing at him. . . . He is afraid that someone is trying to poison him. He talks of the organization that is manipulating him and that someone has put "voodoo

4

dolls" on him.

Defendant also presented expert testimony from Dr. Michael Abramsky, a board-certified clinical and forensic psychologist. Dr. Abramsky testified that defendant's bizarre behavior at the time of the shooting and ensuing standoff "suggests that he was mentally ill at the time" and that defendant's drug-induced organic brain damage,[3] combined with his ingestion of alcohol and various prescription drugs, was the likely cause not only of his behavior but his claimed loss of memory of the incident. In sum, Dr. Abramsky believed that defendant suffered from diminished capacity and that he therefore could not formulate a specific intent.

In rebuttal, the prosecution presented the testimony of Dr. George Watson of the Center for Forensic Psychiatry. Although he acknowledged defendant's apparent organic brain damage, Dr. Watson did not believe defendant to be obviously and acutely psychotic. Instead, on the basis of his clinical interview, Dr. Watson believed "that the possibility of Mr. Carpenter exaggerating appeared to be more likely . . . ."

In a comprehensive written opinion, the trial court issued its findings. The court found defendant guilty of resisting and obstructing a police officer and being a felon in possession of a firearm. Regarding the two counts of

---

[3]Defendant has a history of marijuana and cocaine abuse.

assault with intent to commit murder, the court found that the prosecution had failed to prove that defendant intended to kill either victim. Instead, the court found that the evidence only supported a finding of guilt on the lesser offense of felonious assault. Finally, the trial court found defendant guilty as charged of both first-degree home invasion and possession of a firearm during the commission of a felony.

The court proceeded to address and reject defendant's diminished capacity defense:

> The [c]ourt does not find that the defendant has supported his burden of proof of diminished capacity by a preponderance of the evidence. His actions seem very "goal oriented" . . . . His actions in driving to Ms. Thomas's home, his ringing the door bell, the epitaphs [sic] of displeasure, his entry into Ms. Thomas's home, his aiming the gun, his shots into the ceiling and near the ceiling scaring the victims, his striking Mr. Blakely and Ms. Thomas, his departure from the home, and significantly, his threatening phone call back to [Ms.] Thomas, all suggest very goal oriented actions consistent with the capacity to form a specific intent.

The trial court eventually sentenced defendant to the following prison terms: twenty-eight months to twenty years for the home invasion conviction, twenty-eight months to four years for each of the felonious assault convictions, twenty-eight months to five years for the felon-in-possession conviction, and one to two years for the resisting and obstructing conviction. The court further ordered that these sentences be served consecutive to the mandatory two-year term

for the felony-firearm conviction.

In affirming defendant's convictions and sentences, the Court of Appeals rejected defendant's argument that the trial court erred in shifting the burden to defendant to prove his claim of diminished capacity by a preponderance of the evidence.[4]

This Court granted defendant's application for leave to appeal. 462 Mich 912 (2000).

## II. Standard of Review

The proper application of MCL 768.21a is a question of law subject to de novo review. *People v Rodriguez*, 463 Mich 466, 471; 620 NW2d 13 (2000).

## III. The Traditional Insanity Defense

In Michigan, use of the insanity defense has been governed by statute since 1975. 1975 PA 180. Legal insanity is an affirmative defense requiring proof that, as a result of mental illness or being mentally retarded as defined in the mental health code, the defendant lacked "substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or conform his or her conduct to the requirements of the law." MCL 768.21a(1).[5]

---

[4]Unpublished opinion per curiam, issued July 16, 1999 (Docket No. 204051).

[5]However, "[a]n individual who was under the influence of voluntarily consumed or injected alcohol or controlled
(continued...)

7

Importantly, the statute provides that "[t]he *defendant* has the burden of proving the defense of insanity by a preponderance of the evidence."  MCL 768.21a(3) (emphasis added).

There are also several procedural requirements that must be satisfied before an insanity defense may be raised.  We recently summarized those requirements in *People v Toma*, 462 Mich 281, 292, n 6; 613 NW2d 694 (2000):

> A defendant in a felony case who wishes to interpose an insanity defense, must serve written notice on the court and the prosecutor not less than thirty days before trial and submit to a court-ordered examination, relating to the claim of insanity, by personnel for the center for forensic psychiatry or other qualified personnel.  MCL 768.20a(1) and (2); MSA 28.1043(1)(1) and (2).  A defendant or the prosecutor may also obtain independent psychiatric examinations.  MCL 768.20a(3); MSA 28.1043(1)(3).  The failure by the defendant to fully cooperate in either the court-directed or independent examinations, bars the defendant from presenting testimony relating to insanity at trial.  MCL 768.20a(4); MSA 28.1043(1)(4).

Finally, MCL 768.36 sets forth the consequences of a jury's finding that a defendant is guilty of an offense and that, although the defendant was mentally ill at the time the offense charged was committed, the defendant was *not* legally insane.  If a defendant is found "guilty but mentally ill,"

---

[5](...continued)
substances at the time of his or her alleged offense is not considered to have been legally insane solely because of being under the influence of the alcohol or controlled substances."  MCL 768.21a(2).

8

the trial court "shall impose any sentence which could be imposed pursuant to law upon a defendant who is convicted of the same offense." MCL 768.36(3). If incarcerated, the defendant must "undergo further evaluation and be given such treatment as is psychiatrically indicated for his mental illness or retardation." *Id*. If the defendant is placed on probation, "the trial judge, upon recommendation of the center for forensic psychiatry, shall make treatment a condition of probation." MCL 768.36(4).

### IV. The "Diminished Capacity" Defense

As defined by our Court of Appeals, the so-called "diminished capacity" defense allows a defendant, even though legally sane, to offer evidence of some mental abnormality to negate the specific intent required to commit a particular crime. See, e.g., *People v Jones*, 151 Mich App 1, 5-6; 390 NW2d 189 (1986). "[T]he theory is that if because of mental disease or defect a defendant cannot form the specific state of mind required as an essential element of a crime, he may be convicted only of a lower grade of the offense not requiring that particular mental element." *Chestnut v State*, 538 So 2d 820, 822 (Fla, 1989) (citation omitted).

This Court has several times acknowledged in passing the concept of the diminished capacity defense. See, e.g., *People v Lloyd*, 459 Mich 433; 590 NW2d 738 (1999) (holding that defense counsel was not constitutionally ineffective for

presenting a diminished capacity defense as opposed to a defense of legal insanity); *People v Pickens*, 446 Mich 298; 521 NW2d 797 (1994) (holding that the defendant was not prejudiced by counsel's failure to pursue a diminished capacity defense); *People v Griffin*, 433 Mich 860; 444 NW2d 139 (1989) (remanding for a hearing on the defendant's claim that trial counsel was ineffective for failing to explore defenses of diminished capacity and insanity). However, we have never specifically authorized its use in Michigan courts.

Instead, it was our Court of Appeals, in *People v Lynch*, 47 Mich App 8; 208 NW2d 656 (1973), that introduced to Michigan the diminished capacity defense. The defendant in *Lynch* was charged with having murdered her baby by starvation. As part of her defense, the defendant sought to have admitted into evidence testimony from two psychiatrists supporting her claim that she did not possess the requisite intent to be convicted of first-degree murder, MCL 750.316. The trial court refused to admit the evidence on the ground that the defendant had never raised an insanity defense and did not give the required statutory notice.[6]

In reversing the defendant's jury conviction, the Court of Appeals rejected the prosecution's argument that allowing evidence of mental illness less than insanity as bearing on

_____

[6]At the time *Lynch* was decided, the notice provision for raising an insanity defense was contained in MCL 768.20.

10

the defendant's capacity to form the intent required to commit a particular crime would "sanction a subterfuge" avoiding the standards of the insanity defense enunciated by this Court in *People v Durfee*, 62 Mich 487; 29 NW 109 (1886).[7]  The Court also disagreed that recognizing a diminished capacity defense separate from legal insanity "would permit the defense to in effect sneak in the insanity defense without labeling it as such and without the necessity of complying with the notice statute as to the insanity defense."  *Lynch, supra* at 20. While it acknowledged that some states viewed mental capacity as "an all or nothing matter and that only insanity . . . negates criminal intent," the Court of Appeals concluded that proof of diminished capacity is admissible as "bearing on

---

[7]Before the Legislature's enactment of 1975 PA 180, the test for determining legal insanity was controlled by *Durfee*. The *Durfee* test, in turn, was based in part on the *M'Naghten* rule:  "'[A]t the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong.'"  *People v Martin*, 386 Mich 407, 415; 192 NW2d 215 (1971), quoting *Daniel M'Naghten's Case*, (HL 1843) 10 Cl Fin 200 (8 Eng Rep 718), 722 (1843).

In addition to the *M'Naghten* rule, which focuses solely on a defendant's cognitive abilities, the *Durfee* Court added a volitional component asking whether the defendant's mental disease or abnormality prevented him from controlling his actions.  This second component has commonly been referred to as the "irresistible impulse" test.  In *Martin, supra* at 418, we explained the "salient elements" of the *Durfee* test as follows:  "1) whether defendant knew what he was doing was right or wrong; and 2) if he did, did he have the power, the will power, to resist doing the wrongful act?"

11

intent generally or at least on those special states of mind where a specific intent is required or whether the state of mind by definition determines the degree of offense as here." *Id*.

In *People v Mangiapane*, 85 Mich App 379; 271 NW2d 240 (1978), the Court of Appeals had occasion to address the diminished capacity concept under the current statutory framework established by 1975 PA 180. In *Mangiapane*, the defendant sought to introduce psychiatric testimony on the issue of his capacity to form the specific intent to commit assault with intent to commit murder in violation of MCL 750.83. The trial court denied the request on the ground that the defendant did not raise the defense and give the prosecution notice under MCL 768.20a.

The Court of Appeals affirmed, explaining that, by enacting 1975 PA 180, the Legislature intended "to bring under one procedural blanket all defenses to criminal charges that rest upon legal insanity as defined in the statute," and that "the defense known as diminished capacity comes within th[e] codified definition of legal insanity." *Id.* at 394-395. Thus, the Court held that, in order to introduce evidence that, although not legally insane, the defendant lacked mental capacity to form specific intent, the defendant had to fully comply with the statutory insanity defense provisions. *Id.* at 395-396.

12

The Court of Appeals decision in *Mangiapane* was then followed by a series of decisions continuing to address diminished capacity defense as a form of the statutory insanity defense. See, e.g., *People v Denton*, 138 Mich App 568; 360 NW2d 245 (1984); *People v Anderson*, 166 Mich App 455; 421 NW2d 200 (1988).

Consistent with this line of cases, the Court of Appeals held that a defendant seeking to present a diminished capacity defense bears the burden of establishing such a defense by a preponderance of the evidence under MCL 768.21a(3), which took effect on October 1, 1994. Defendant challenges that holding, arguing that nothing in the language of § 21a suggests a legislative intent to place on defendants the burden of proving diminished capacity.

We agree with defendant that there is no indication in § 21a that the Legislature intended to make diminished capacity an affirmative defense. However, that is only because, as explained below, the Legislature's enactment of a comprehensive statutory scheme concerning defenses based on either mental illness or mental retardation demonstrates the Legislature's intent to preclude the use of *any* evidence of a defendant's lack of mental capacity short of legal insanity to avoid or reduce criminal responsibility by negating specific intent.

## V. The Continued Viability of the Diminished Capacity Defense in Michigan

Since its inception in the United States, the diminished capacity defense has been the subject of much debate.[8] At present, there is a wide divergence of views among the states concerning the admissibility of evidence of mental illness short of insanity. See, generally, 1 Robinson, Criminal Law Defenses, § 64(a), pp 272-279. A common criticism is that the subtle gradations of mental illness recognized in the psychiatric field are of little utility in determining criminal responsibility:

> "[T]o the psychiatrist mental cases are a series of imperceptible gradations from the mild psychopath to the extreme psychotic, whereas criminal law allows for no gradations. It requires a final decisive moral judgment of the culpability of the accused. For the purposes of conviction there is no twilight zone between abnormality and insanity. An offender is wholly sane or wholly insane." [*State v Bouwman*, 328 NW2d 703, 706 (Minn, 1982) (citations omitted).]

In *State v Wilcox*, 70 Ohio St 2d 182, 192-193; 436 NE2d 523 (1982), the court expressed a similar view:

---

[8]It apparently is well recognized that the diminished capacity defense originated in Scotland in 1867. See *State v Wilcox*, 70 Ohio St 2d 182; 436 NE2d 523 (1982); Arenella, *The diminished capacity and diminished responsibility defenses: Two children of a doomed marriage*, 77 Columbia L R 827, 830, n 16 (1977). The state of California, in turn, is considered to be the jurisdiction that pioneered the defense in the United States. *Wilcox*, *supra* at 187; see also *State v Sessions*, 645 P2d 643, 644, n 2 (Utah, 1982) ("[*People v Wells*, 33 Cal 2d 330; 202 P 2d 53 (1949)] is credited with beginning the diminished capacity in California").

> Theoretically the insanity concept operates as a bright line test separating the criminally responsible from the criminally irresponsible. The diminished capacity concept on the other hand posits a series of rather blurry lines representing gradations of culpability.

We need not join the affray because we agree with the prosecution that our Legislature, by enacting the comprehensive statutory framework described above, has already conclusively determined when mental incapacity can serve as a basis for relieving one from criminal responsibility. We conclude that, through this framework, the Legislature has created an all or nothing insanity defense. Central to our holding is the fact that the Legislature has already contemplated and addressed situations involving persons who are mentally ill or retarded yet not legally insane. As noted above, such a person may be found "guilty but mentally ill" and must be sentenced in the same manner as any other defendant committing the same offense and subject to psychiatric evaluation and treatment. MCL 768.36(3). Through this statutory provision, the Legislature has demonstrated its policy choice that evidence of mental incapacity short of insanity cannot be used to avoid or reduce criminal responsibility by negating specific intent.

As a final matter, we note that even persons *acquitted* of an offense by reason of insanity may be confined and required to undergo evaluation and treatment. MCL 330.2050. As we

15

explained in *People v Webb*, 458 Mich 265, 281; 580 NW2d 884 (1998), MCL 330.2050 is "a measure to promote public safety. Persons acquitted by reason of insanity, particularly where the facts are grave, cannot be allowed simply to walk out the front door of the courthouse. The statute is clearly designed to establish a procedure by which it can be determined whether the person can safely reenter society." We agree with the Supreme Court of Wisconsin that

> [w]here . . . the statutes provide that a person found not guilty by reason of insanity is to be committed to a mental treatment facility until recovered and until his return to society presents no danger to the public, the introduction of evidence of mental condition on the question of impaired capacity to form intent during the guilt phase of the trial could well be required to acquit the defendant, sane or insane, without ever inquiring into the issue of sanity and without regard to the provisions of the statute requiring treatment of those pleading and establishing insanity. [*Steele v State*, 97 Wis 2d 72, 91; 294 NW2d 2 (1980) (citation omitted).]

Similar sentiments were expressed in *Bethea v United States*, 365 A2d 64, 90-91 (DC App, 1976), a decision that is widely cited for the view that the diminished capacity defense should be rejected:

> Under the present statutory scheme, a successful plea of insanity avoids a conviction, but confronts the accused with the very real possibility of prolonged therapeutic confinement. If, however, psychiatric testimony were generally admissible to cast a reasonable doubt upon whatever degree of mens rea was necessary for the charged offense, thus resulting in outright acquittal, there would be scant reason indeed for a defendant to risk such confinement by arguing the greater

16

form of mental deficiency. Thus, quite apart from the argument that the diminished capacity doctrine would result in a considerably greater likelihood of acquittal for those who by traditional standards would be held responsible, the future safety of the offender as well as the community would be jeopardized by the possibility that one who is genuinely dangerous might obtain his complete freedom merely by applying his psychiatric evidence to the threshold issue of intent.

Like the Supreme Court of Ohio, we decline to adopt an alternative defense to legal insanity "that could swallow up the insanity defense and its attendant commitment provisions." *Wilcox*, *supra* at 189. "[T]he concepts of both diminished capacity and insanity involve a moral choice by the community to withhold a finding of responsibility and its consequence of punishment." *Bethea*, *supra* at 90, n 55.[9] Accordingly, we hold that the insanity defense as established by the Legislature is the sole standard for determining criminal responsibility as it relates to mental illness or

---

[9]It is for this reason that we find to be irrelevant the largely procedural distinction between the affirmative defense of legal insanity and the use of diminished capacity evidence. In either case, a defendant is attempting to avoid responsibility for his actions. In our view, the Legislature, by adopting a comprehensive framework concerning mental illness and retardation as it relates to criminal responsibility, has established that defendants suffering from mental deficiencies amounting to legal insanity "should be acquitted on that ground and treated for their disease. Persons with less serious mental deficiencies should be accountable for their crimes just as everyone else." *Chestnut*, *supra* at 825.

17

retardation.[10]

Defendant, however, maintains that it would violate due process to preclude a defendant from introducing evidence that, although not legally insane, he lacked the mental capacity to form a specific intent. The United States Supreme Court's decision in *Fisher v United States*, 328 US 463; 66 S Ct 1318; 90 L Ed 1382 (1946), dispositively answers this contention in the negative. The defendant in *Fisher* sought an instruction in his District of Columbia murder trial that would have permitted the jury "to weigh evidence of his mental deficiencies, which were short of insanity in the legal sense, in determining the fact of and the accused's capacity for premeditation and deliberation." *Id*. at 470. In upholding the refusal of the trial court to give such an instruction, the Supreme Court noted that "[f]or this Court to force the District of Columbia to adopt such a requirement for criminal trials would involve a fundamental change in the common law

---

[10]We decline the dissent's invitation to address our prior decisions recognizing voluntary intoxication as negating specific intent, see, e.g., *People v Langworthy*, 416 Mich 630; 331 NW2d 171 (1982), as the continued validity of that separate and distinct defense is not before us. While defendant presented evidence that he had been drinking on the night of the offense and that he was taking various prescription drugs, there was no defense claim that intoxication alone precluded defendant from being able to form the requisite specific intent. Rather, the entire defense was based upon defendant's apparent organic brain damage. Indeed, defendant's own expert testified that this was not just a case in which "someone went out and drank."

18

theory of responsibility." *Id*. at 476. The Court concluded that

> [s]uch a radical departure from common law concepts is more properly a subject for the exercise of legislative power or at least for the discretion of the courts of the District. The administration of criminal law in matters not affected by Constitutional limitations or a general federal law is a matter peculiarly of local concern. [*Id*. at 476.]

Given the clear message of the Court's decision in *Fisher*, the reliance by both defendant and the dissent on other United States Supreme Court decisions not addressing the issue presented here is not persuasive. Indeed, the Seventh Circuit Court of Appeals relied on *Fisher* to reach the same decision we do today: "[A] state is not constitutionally compelled to recognize the doctrine of diminished capacity and hence a state may exclude expert testimony offered for the purpose of establishing that a criminal defendant lacked the capacity to form a specific intent." *Muench v Israel*, 715 F2d 1124, 1144-145 (CA 7, 1982); see also *Mott*, *supra* at 541 ("*Fisher* stands for the proposition that state legislatures, without violating the constitution, may preclude defendants from offering evidence of mental and psychological deficiencies to challenge the elements of a crime").

## VI. Conclusion

The Legislature has enacted a comprehensive statutory scheme setting forth the requirements for and the effects of

19

asserting a defense based on either mental illness or mental retardation. We conclude that, in so doing, the Legislature has signified its intent not to allow evidence of a defendant's lack of mental capacity short of legal insanity to avoid or reduce criminal responsibility by negating specific intent. Rather, the insanity defense as established by the Legislature is the sole standard for determining criminal responsibility as it relates to mental illness or retardation. Consequently, we affirm the decision of the Court of Appeals on this alternative basis.

CORRIGAN, C.J., and WEAVER, TAYLOR, and MARKMAN, JJ., concurred with YOUNG, J.

20

# STATE OF MICHIGAN

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

v                                          No. 115617

JAMES A. CARPENTER,

     Defendant-Appellant.

_____

KELLY, J. (*dissenting*).

I disagree that the Legislature has signified its intent to preclude a defendant from negating mens rea by introducing evidence of mental illness short of legal insanity.

For the state to obtain a conviction of certain crimes, the Legislature requires that it prove beyond a reasonable doubt that the accused acted with specific intent. I maintain that people accused of those crimes should not be prevented from offering evidence of mental abnormality or illness showing that they acted without the requisite specific intent.

I believe that the majority's broad rule excluding such evidence lacks sound justification. It violates the

presumption of innocence and the due process rights to present a defense and be convicted only upon proof beyond a reasonable doubt of every element of a crime. Thus, I respectfully dissent.[1]

## I. Due Process Rights

The state may not deprive any person "of life, liberty, or property, without due process of law . . . ." US Const, Am XIV; Const 1963, Art 1, § 17. Although an accused has no absolute right to present evidence relevant to his defense, a limitation on his ability to present a defense may, under some circumstances, violate due process. See *Rock v Arkansas*, 483 US 44, 55; 107 S Ct 2704; 97 L Ed 2d 37 (1987); *Chambers v Mississippi*, 410 US 284, 294; 93 S Ct 1038; 35 L Ed 2d 297 (1973). Rules excluding evidence contravene the due process right to present a defense when they infringe a weighty interest of an accused or significantly undermine a fundamental element of the defense. See *United States v Scheffer*, 523 US 303, 308; 118 S Ct 1261; 140 L Ed 2d 413 (1998), citing *Rock*, *supra* at 58; *Chambers*, *supra* at 302.

---

[1]Generally, mental abnormality evidence may negate only specific intent. Indeed, this was the use approved in *People v Lynch,* 47 Mich App 8, 20-21; 208 NW2d 656 (1973). Accordingly, the focus here is on psychiatric evidence presented for that purpose. This opinion should not be construed as advocating the use of psychiatric evidence of mental abnormality or illness to negate the requisite mens rea in general intent crimes.

Several United States Supreme Court cases have addressed an accused's right to present evidence in support of his defense. In *Chambers*,[2] the Supreme Court held that Mississippi's evidentiary rules deprived the defendant of a fair trial. They prevented him from calling witnesses who would have testified that another witness made trustworthy, inculpatory statements on the night of the crime. The Court reasoned that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanically to defeat the ends of justice." *Id*. at 302.

In *Washington v Texas*,[3] the trial court denied the defendant's request to have a defense witness testify. The court relied on Texas statutes providing that persons charged or convicted as coparticipants in the same crime could testify for the state but not for one another. Defendant sought to call a witness who would have offered relevant and material evidence for the defense. The Supreme Court held that the categorical exclusion of the witness was an unconstitutional and arbitrary denial of the defendant's rights. *Id*. at 23.

---

[2]*Supra* at 302-303.

[3]388 US 14; 87 S Ct 1920; 18 L Ed 2d 1019 (1967).

Later, in *Crane v Kentucky*,[4] the Supreme Court held that the defendant's right to have a fair opportunity to present a defense was violated by the trial court's blanket exclusion of evidence. The Court found that the evidence was competent and reliable, that it bore on the reliability of a confession, and that it was central to the defendant's claim of innocence.

The common thread of *Chambers*, *Washington*, and *Crane* is the due process requirement that an accused be permitted a fair opportunity to defend against any and all state accusations. A fair opportunity to defend, if meaningful, must entail adversarial testing of the state's case against the accused. It must mean that the state may not prevent an accused from raising an effective defense. The state may not impede a defendant's right to put on a defense by imposing either mechanical or arbitrary rules of evidence. See *Montana v Egelhoff*, 518 US 37, 63-64; 116 S Ct 2013; 135 L Ed 2d 361 (1996) (O'Connor, J., dissenting, joined by Stevens, Souter, and Breyer, JJ.).

Today, the majority creates a rule per se prohibiting an accused from introducing evidence that, because of mental abnormality or illness, he lacked the specific intent to commit the crime. Under my view of controlling United States Supreme Court authority, this exclusion denies an accused his

---

[4] 476 US 683, 687; 106 S Ct 2142; 90 L Ed 2d 636 (1986).

due process right to present a defense.

Although, as noted, the right is not entirely limitless, an essential component of procedural fairness is an opportunity to be heard. That opportunity becomes an empty one when the state is permitted to exclude competent, reliable evidence directly affecting the ascertainment of guilt. See *Crane*, *supra* at 690 (citations omitted); see also *Chambers*, *supra* at 302; *State v Ellis*, 136 Wash 2d 498, 527; 963 P2d 843 (1998); *United States v Pohlot*, 827 F2d 889, 900-901 (CA 3, 1987). Hence, by foreclosing challenges to the state's proof concerning an essential element of the crime charged, the majority's broad rule impermissibly undermines a fundamental element of an accused's defense. It denies defendants with mental abnormalities their due process right to present a defense.

Moreover, the majority has impermissibly diminished the constitutional requirement of prosecutorial proof of guilt beyond a reasonable doubt on each element of the charged offense. The United States Supreme Court held in *In re Winship*,[5] that due process protects an accused against conviction except upon proof beyond a reasonable doubt of every element of the charged criminal offense. Where a certain

---

[5]397 US 358, 363-364; 90 S Ct 1068; 25 L Ed 2d 368 (1970).

mental state is an element of the crime, the government must allege and prove that mental state. See *Morissette v United States*, 342 US 246, 275; 72 S Ct 240; 96 L Ed 288 (1952).

The case of *Martin v Ohio*,[6] is instructive. There, the United States Supreme Court considered an Ohio statute that placed on a defendant the burden of proving by a preponderance of the evidence an affirmative defense like self-defense. The Court held that the statute did not violate due process; however, it noted, it would have been error to instruct the jury that "self-defense evidence could not be considered in determining whether there was a reasonable doubt about the state's case" where Ohio's definition of the intent element made self-defense evidence the state's burden. *Id*. at 233-234. Such an instruction would have been improper because it would have relieved the State of its burden and "plainly run afoul of *Winship's* mandate." *Id*. at 234.

Here, although the Legislature has required proof beyond a reasonable doubt of mens rea,[7] the majority has rendered inadmissible evidence relevant to negating the mens rea. In so doing, it has foreclosed any meaningful challenge to the prosecution's proofs. With respect to specific intent crimes,

---

[6]480 US 228; 107 S Ct 1098; 94 L Ed 2d 267 (1987).

[7]Black's Law Dictionary, 6th ed, defines "mens rea" as "criminal intent."

6

at least, I believe that this "cut[s] against our traditional concept of the adversary system" and "downgrades the prosecution's burden to something less than that mandated by due process of law." *People v Hendershott*, 653 P2d 385, 393 (Colo, 1982).

The majority asserts that *Fisher v United States*,[8] dispositively answers in the negative the question whether its holding today violates due process. In *Fisher*, the defendant was charged with first-degree premeditated murder arising from an incident inside a Washington, D.C., library. The defendant was the library's janitor. The evidence showed that on the fatal morning, the librarian told the defendant that he was not doing the work for which he was being paid, and in the course of her scolding called him a "black nigger." *Id.* at 479 (Frankfurter, J., dissenting). In anger, the defendant slapped the librarian "impulsively," causing her to scream. He then retrieved a piece of wood and struck her with it, after which he seized her by the throat until she went limp.

The defense theory was that he never wanted to kill the librarian, but wanted to stop her screaming, which unnerved him. *Id.* at 479-480 (Frankfurter, J., dissenting). At the close of proofs, the trial court instructed on insanity, irresistible impulse, malice, deliberation, and premeditation.

---

[8]328 US 463; 66 S Ct 1318; 90 L Ed 1382 (1946).

Over defense counsel's objection, the trial court refused to give the following instruction:

> The jury is instructed that in considering the question of intent or lack of intent to kill on the part of the defendant, the question of premeditation or no premeditation, deliberation or no deliberation, whether or not the defendant at the time of the fatal acts was of sound memory and discretion, it should consider the entire personality of the defendant, his mental, nervous, emotional and physical characteristics as developed by the evidence in the case. [*Id.* at 470-471, n 6.[9]]

Defendant was convicted as charged of first-degree murder.

The Supreme Court affirmed the conviction. It upheld the refusal to give the defendant's requested instruction. The Court noted that the defendant was challenging a local evidentiary rule that was long established and deeply rooted in the District of Columbia. *Id.* at 477. It declined to force the District of Columbia to enact the rule of responsibility that the defendant sought, labeling the request "a fundamental change in the common law theory of responsibility." *Id.* at

---

[9]The requested instruction related to the defendant's claim that, in assessing whether the defendant, in fact, deliberated, the jury should be able to consider the following factors: defendant's chronic alcoholic nature, his limited intellect, his limited "judgment and comprehension," as well as his race. See Siegel, Felix Frankfurter, Charles Hamilton Houston and the "N-word": A case study in the evolution of judicial attitudes toward race, 7 S Cal Interdisciplinary L J 317, 346-351, 355 (1998), discussing the *Fisher* decision in great depth. Given these broad proffered factors, one scholar considered *Fisher* to be arguably more of a provocation case than a diminished capacity case. See *id.* at 370, stating that the defendant's real defense was that racism "explained, if not legally caused, the crime."

476.[10]

The majority is correct that the Supreme Court in *Fisher* approved of the refusal to give an instruction bearing on whether a defendant acted with the requisite specific intent. However, I disagree that it resolves the instant defendant's due process challenge.

First, while the Supreme Court has never explicitly overruled *Fisher*, it has arguably done so by implication. *Fisher* must be interpreted in light of subsequent Supreme Court decisions. In my view, the line of cases starting with *In re Winship* and ending with *Martin* creates the inference that the rule of *Fisher* has been implicitly overruled.[11]

---

[10]In *Griffin v United States*, 336 US 704; 69 S Ct 814; 93 L Ed 993 (1949), Justice Murphy stated that the Supreme Court's decision in *Fisher* was based, in part, on the Court's reluctance to upset a District of Columbia evidence rule that existed when the case arose. That rule provided that "'mental deficiency which does not show legal irresponsibility' is not 'a relevant factor in determining whether an accused is guilty of murder in the first or second degree.'" *Id.* at 722 (Murphy, J., dissenting); see, generally, *Fisher*, *supra*, declining the defendant's request to declare evidence of mental deficiency short of legal insanity a relevant factor in determining one's guilt of first-degree murder.

[11]See Benjamin, The jurisdictional implications of a mens rea approach to insanity: Plugging the "detainment gap" after *Foucha v Louisiana*, 19 U Dayton L R 41, 61, n 114 (1993); see also United States v *Brawner*, 471 F2d 969, 1001-1002 (DC CA, 1972) (en banc), superseded by statute on other grounds, as stated in *Shannon v United States*, 512 US 573, 582; 114 S Ct 2419; 129 L Ed 2d 459 (1994), rejected by *Bethea v United States*, 365 A2d 64, 83-92 (DC App, 1976), noting how subsequent cases have "undercut the *Fisher* approach," which it
(continued...)

9

In addition, more recent and, in my view, persuasive authority exists demonstrating the constitutional infirmity of barring evidence of one's mental abnormalities short of insanity to negate specific intent. See, e.g., *Pohlot*, *supra* at 901,[12] stating that "a rule barring evidence [of the defendant's mental abnormality] on the issue of mens rea may be unconstitutional so long as we determine criminal liability in part through subjective states of mind;" See also *Ellis*, *supra* at 523; *Hendershott*, *supra* at 393.

In light of the above, I believe that *Fisher* does not control the instant case. Rather, I maintain that the majority's rule of exclusion violates due process. As the Colorado Supreme Court so astutely stated:

> While it may be permissible to permit a jury to infer an essential ingredient of a crime from a proven fact so long as there is a rational connection between the proven fact and the inferred fact, e.g., *Barnes v United States*, 412 US 837; 93 S Ct 2357; 37 L Ed 2d 380 (1973); *Tot v United States*, 319 US 463; 63 S Ct 1241; 87 L Ed 1519 (1943), it is quite another matter to insulate this ingredient from disproof by defense evidence. A

---

[11](...continued) referred to as "draconic;" *Pohlot*, *supra* at 900-901.

[12]In *Pohlot*, the Court was unpersuaded by either *Fisher* or federal circuit court decisions following *Fisher*. It stated that those cases failed to distinguish "between the use of evidence to negate mens rea and a broader diminished capacity defense. The recent circuit court opinions also focus on the exclusion of expert opinion evidence, not on the exclusion of all evidence of mental abnormality, including the defendant's own testimony." *Pohlot*, *supra* at 901, n 12.

10

rule precluding the defendant from contesting the culpability element of the charge would render the prosecution's evidence on that issue uncontestable as a matter of law, in derogation of the presumption of innocence and the constitutional requirement of prosecutorial proof of guilty beyond a reasonable doubt. E.g., *Sandstrom v Montana*, 442 US [510, 520-524; 99 S Ct 2450; 61 L Ed 2d 39 (1979)]; *Morrissette* [*supra* at 274-275]. [*Hendershott, supra* at 391.]

There can be no question that the majority's holding affixes a heavy burden on defendants' due process rights. Because the majority provides no plausible justification, I think its holding violates due process.

## II. No Plausible Justification for the Majority's Broad Rule of Exclusion

According to the majority, by enacting the insanity[13] and guilty but mentally ill (GBMI)[14] statutes, the Legislature created a scheme. It provided the requirements for and the effects of asserting a defense based on mental illness or retardation. The majority deduces from the scheme an intent to bar evidence of a defendant's lack of mental capacity short of insanity to negate specific intent. I disagree, and find its statutory interpretation analysis unpersuasive.

The first step in statutory interpretation is to give effect to the intent of the Legislature. See *Tryc v Michigan Veterans Facility*, 451 Mich 129, 135; 545 NW2d 642 (1996). To

---

[13]MCL 768.21a.

[14]MCL 768.36.

11

do so, we examine first the specific language of the statute. If the language is clear and unambiguous, we assume that the Legislature intended its plain meaning, and we will enforce the statute as written. See *In re MCI Telecommunications Complaint,* 460 Mich 396, 411; 596 NW2d 164 (1999). This Court should reject an interpretation of a statute that speculates about Legislative intent and requires us to add language into the statute. See *id.* at 414.

Here, importantly, neither the insanity statute nor the GBMI statute mentions the permissibility of using evidence of mental abnormality to negate specific intent. Rather, both statutes concern affirmative defenses available to a legally insane defendant.[15] These two statutes, by their plain language, apply only if a defendant seeks to introduce evidence of a mental illness to justify or excuse an otherwise criminal act.

This clearly contrasts with the introduction of diminished capacity evidence. The use of such evidence does not constitute an affirmative defense. See *Pohlot, supra* at 897. A defendant claiming diminished capacity does not admit guilt of the crime charged or assert that he is legally

---

[15]The insanity statute provides that legal insanity "[i]s an affirmative defense." MCL 768.21a. The GBMI statute expressly provides that it applies "[i]f the defendant asserts a defense of insanity . . . ." MCL 768.36.

12

insane. Rather, he denies the prosecution's prima facie case by challenging its claim that he possessed the requisite mens rea at the time of the crime.[16] Hence, insanity evidence to prove the affirmative defense of legal insanity is distinct from diminished capacity evidence to disprove the requisite mens rea of a specific intent crime. See *United States v Gonyea*, 140 F3d 649, 651 (CA 6, 1998).[17]

I consider the distinction between the two,[18] coupled with the absence of language in the insanity and GBMI statutes addressing the use of evidence of mental abnormality to negate

---

[16]See Morse, *Undiminished confusion in diminished capacity*, 75 J Crim L & Criminology 1, 6 (1984).

[17]Moreover, diminished capacity represents a degree of mental impairment short of legal insanity. See Britton & Bennett, Adopt guilty but mentally ill?-No!, 15 U Tol L R 203, 211 (1983).

[18]The majority attempts to group diminished capacity evidence into the insanity and GBMI statutory scheme. It does this by asserting that a defendant who uses diminished capacity evidence, like one who uses insanity evidence, is trying to "avoid responsibility." Slip op at 17, n 9. The assertion is simply inaccurate. Put most simply, one who uses diminished capacity evidence seeks merely to ensure that no conviction occurs except upon proof beyond a reasonable doubt of every element of the offense. See *Morse*, *supra* at 6. If diminished capacity evidence creates a reasonable doubt regarding one of the elements of the crime charged, the defendant is not "avoiding responsibility" for that crime. Rather, he is attaining that to which he is constitutionally entitled: an acquittal of that offense. See *Morrissette*, *supra* at 275. In my view, this distinction is significant, and persuades me that the insanity and GBMI statues evidence no clear legislative intent to exclude diminished capacity evidence.

the mens rea. And I cannot conclude that the Legislature intended to bar the use of evidence of one's mental abnormality short of insanity to negate specific intent when it enacted the insanity and GBMI statutes. See MCI Telecommunications, *supra* at 414.[19]

I share the majority's concern that the accused who successfully show that their mental illness negated the requisite mens rea may be set free without treatment or imprisonment. However, that cannot justify reading into legislation a rule of exclusion per se where none exists.

By contrast, our Legislature has made it clear that a person may not be punished for a crime if the prosecution is unable to prove the necessary mens rea.[20] Indeed, as one scholar explained in rejecting a concern similar to the one the majority presents here:

---

[19]Notably, this Court has acknowledged that the Legislative intent in enacting the GBMI statute was to "limit the number of persons who, in the eyes of the Legislature, were *improperly* being relieved of all criminal responsibility by way of the insanity verdict." *People v Ramsey*, 422 Mich 500, 512; 375 NW2d 297 (1985) (emphasis in original). This militates against interpreting the GBMI statute as relating to the concept of diminished capacity.

[20]The situation is analogous to one where a defendant is acquitted of first-degree murder but convicted of manslaughter on the basis of provocation. See *Brawner*, *supra* at 1001, stating that when one's abnormal mental condition short of legal insanity is material in negativing premeditation, it "does not set him 'at liberty' but reduces the degree of the criminal homicide."

14

Some may argue that persons who gain a failure of proof defense through the absence of a culpability requirement, through mistake or mental illness negating a required mental element, for example, are nonetheless dangerous. Special deterrence, then, is undercut when such failure of proof defenses are relied upon. The response is simple: if significant purposes of the criminal law are satisfied by a criminal conviction in this situation, then the offense should be redefined without the mental element requirements. If the purposes of conviction and punishment would not be satisfied by such an alteration, then the defense remains appropriate. [1 Robinson, Criminal Law Defenses, § 32(b), p 123, n 8.]

Moreover, in most cases, defendants who successfully negate prosecutors' proofs will be convicted of a lesser, general intent offense. Even if lesser offenses are inapplicable, procedures exist for civil commitment of those acquitted of crimes who are considered potentially dangerous.[21] In any event, the proper resolution of this concern is not to bar relevant evidence.[22]

The majority also attempts to justify its holding by asserting that a contrary rule would render the insanity

---

[21]See MCL 330.1472a, providing *inter alia*, for the civil admission of mentally ill persons; MCL 330.1498a *et seq.*, civil admission of emotionally disturbed minors; MCL 330.1500 *et seq.*, civil admission of developmentally disabled individuals; see also *Hendershott*, *supra* at 395.

[22]See *People v Wetmore*, 22 Cal 3d 318, 328; 149 Cal Rptr 265; 583 P2d 1308 (1978), superseded by 1981 Cal Stat 404, § 4, current version at Cal Penal Code, §§ 28-29 (West 1988), stating that "we do not perceive how a defendant who has in his possession evidence which rebuts an element of the crime can logically be denied the right to present that evidence merely because it will result in his acquittal."

15

defense superfluous. That a defendant has the right to introduce psychiatric evidence to support the affirmative defense of insanity does not justify barring relevant evidence negating the prosecutor's case in chief. See *Pohlot*, *supra* at 901. Also, because evidence supporting an insanity defense and evidence negating specific intent address distinct questions, the breadth of the former is irrelevant to the question of the latter's admissibility.

The majority has taken the extreme step of barring defendants from introducing psychiatric evidence of mental abnormality to negate the mens rea of the crime charged. Because the rule it creates lacks sound justification, and because it renders the prosecution's proofs on the intent element essentially uncontestable, it violates defendant's due process rights. See generally *Sandstrom*, *supra* at 520-524; *Morrissette*, *supra* at 275; *Martin*, *supra* at 233-234.[23]

## III. Authority from Other Jurisdictions

Several jurisdictions that have considered the admissibility of evidence of mental abnormality to negate mens rea have reached a conclusion contrary to that of the

---

[23]Given that this Court recognizes evidence of voluntary intoxication to negate specific intent, the majority's rejection of mental abnormality evidence, used for the very same purpose, defies explanation. See *Brawner*, *supra* at 999; *Phipps*, *supra* at 148; *State v Correra*, 430 A 2d 1251, 1253-1254 (RI, 1981).

16

majority today. See Compton, *Expert witness testimony and the diminished capacity defense*, 20 Am J Trial Advoc 381, 387-388, n 63 (1996-1997); *State v Mott*, 187 Ariz 536, 555; 931 P2d 1046 (1997) (Feldman, J., dissenting). Nearly every federal circuit court has concluded that the insanity defense reform act[24] does not bar evidence of mental abnormality to negate mens rea. See *Pohlot*, *supra* at 900-901; *United States v Marenghi*, 893 F Supp 85, 89 (D Me, 1995) (collecting cases).

I would follow this persuasive authority, and conclude that evidence of mental abnormality or illness is admissible to negate specific intent. Such a position merely reaffirms three concepts basic to our system of jurisprudence: the right to present a meaningful defense, the requirement that the state prove beyond a reasonable doubt each and every element of a charged offense, and the presumption of innocence.

## IV. Conclusion

The majority categorically excludes relevant and material evidence that directly concerns an essential element of

---

[24]18 USC 17 provides, in pertinent part:

(a) Affirmative defense. It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

17

specific intent crimes. This violates a defendant's due process right to present a defense, ignores the requirement of proof of guilt beyond a reasonable doubt, and derogates the presumption of innocence. Because the majority fails to justify its heavy burdening of defendants' due process rights, I am unable to join its opinion.

I write, also, because I am troubled that the majority is deciding this case on a ground that the prosecutor never argued until its brief on appeal to this Court. To the extent that this Court rejects arguments not raised below by criminal defendants, it should reject those not raised below by the prosecution. Adding insult to injury, the majority has turned the prosecution's tardy argument into a rule of exclusion that, I believe, cannot withstand constitutional scrutiny. For these reasons, I respectfully dissent.

CAVANAGH, J., concurred with KELLY, J.